IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA BAKER, et al.,                )
                                   )
        Plaintiffs,                )
                                   )
Vs.                                )        CIVIL ACTION FILE
                                   )        NO. 1:21-CV-04186-MLB
CITY OF ATLANTA, et al.            )
                                   )
        Defendants.                )

**JOINT STIPULATION OF ALL PARTIES TO MATERIAL FACTS THAT
ARE NOT IN DISPUTE IN SUPPORT OR OPPOSTION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

COME NOW ALL PARTIES in this Dispute, by and through their Counsel of

Record, whose signatures appear below, and stipulate and agree that the following

facts are true for purposes of the Court's ruling on any Motion for Summary

Judgment filed by any Party to this dispute. The Parties do not stipulate or agree that

these facts are admitted or established without further proof if the case is set for trial

before a jury.

1.

The Atlanta Police Department generally allowed protests that did not disrupt

traffic, threaten property damage or personal injury, or otherwise threaten public

safety.

2.

As a result of the social unrest in Atlanta in 2020, beginning especially after George Floyd's murder, APD prepared for planned protests by alerting specialized units to the possibility those units' presence may be necessary to address threats or violations of the law during protests.

3.

On January 6, 2021, then Lieutenant, now Deputy Chief (retired), Gary Harper (hereinafter "Harper" or "Deputy Chief Harper") was assigned to the Special Operations unit for the Atlanta Police Department. (Harper deposition at p. 13, l. 24 to p. 14, l. 9).

4.

The Special Response Unit (later section) was tasked with utilizing intelligence from other units and planning tactical responses to large scale events, including The Atlanta Marathon, the Peachtree Road Race, Political Rallies, and protests. (Harper depo. at p. 17, l. 10 to l. 20).

5.

If the Special Operations unit learned of a planned protest and had sufficient time, the unit developed an Incident Action Plan utilizing the Incident Command System ("ICS"). (Plaintiff Exhibit 1 at ICS, page 1).

2

6.

On January 6, 2021, the Homeland Security unit of the Atlanta Police Department learned of the possibility of a protest regarding the shooting of Jacob Blake by a police officer in Kenosha WI. (Plaintiff Exhibit 1 at ICS 201, page 1).

7.

The intelligence suggested the protest was associated with a nationwide movement called Solidarity with Kenosha. (Plaintiff Exhibit 1 at ICS 201, page 1).

8.

As a result of the information gathered by other units, and the Incident Action Plan developed in response to that information, the Joint Operations Center was activated to maintain overall command and control of the situation. (Plaintiff Exhibit 1 at ICS 201, page 3).

9.

According to the information obtained, the event was scheduled to begin at the entrance to Centennial Olympic Park ("COP") at 8:00 p.m., on January 6, 2021. (Plaintiff Exhibit 1 at ICS 201, page 1).

10.

Harper prepared an Incident Action Plan in accordance with Standard Operating Procedure and the precinct and unit commanders were briefed. Plaintiff's Exhibit 1; Harper depo., p. 74, l. 2 to l. 20; p. 77, l. 21 to p. 78, l. 10).

11.

A group, including the Plaintiffs, gathered at the entrance of COP around 8:00 pm on January 6, 2021. Amended Complaint.

12.

For approximately an hour, the protesters engaged in a candlelight vigil at the entrance of COP. Amended Complaint. Amended Complaint.

13.

The group left the entrance of COP and marched in the street on Centennial Olympic Park Drive to Andrew Young International Boulevard ("Andy Young Blvd"). Harper depo. at p.166, l.14 to p. 167, l.13; Bruce depo. at p. 46, l. 21 to l. 24.

14.

Harper requested the presence of a number of specialized units, including the following: Zone 1 Crime Suppression Unit, Zone 2 Crime Suppression Unit, Zone 3 Crime Suppression Unit, and Zone 5 Crime Suppression Unit. Plaintiff's Exhibit 1 ICS 203, IAP page 5; and Plaintiff's Exhibit 13 at 2.

15.

Besides Harper, the other defendant officers were members of the specialized units as follows: Zone 1 Crime Suppression Unit, Zone 2 Crime Suppression Unit, Zone 3 Crime Suppression Unit, and Zone 5 Crime Suppression Unit. Plaintiff's Exhibit 13 at 2.

16.

As the group approached the intersection of Andy Young Blvd and Williams Street, Lt. Harper gave the following command over the public address system in his patrol vehicle: "I am Lieutenant Harper a peace officer for the City of Atlanta. I hereby declare that by being in the street or roadway you are obstructing or impeding traffic in violation of the City Ordinance for obstructing traffic. In the name of the State of Georgia I hereby command all those present in the street or roadway at this location to immediately exit the street or roadway. If you do not do so you will be arrested. Should you fail to exit the street you will be in violation of Code Section 150-266 which is obstructing traffic. Please exit the roadway." Harper Body Worn Camera video at time stamp 21:04:42 to 21:05:20.[1]

17.

The warning was given and completed before the group entered the intersection of Andrew Young International Boulevard and Ted Turner Drive. Pritchard Body Worn Camera at time stamp 21:05:30-21:06:12; Ward Body Worn Camera at time stamp 21:05:45 – 21:06:15.

---

[1] Time is recorded in 24 hour or military time, so a time entry of 21:04:42 represents 9:04 and 42 seconds pm.

18.

After the dispersal order was given, the group is seen entering the intersection of Andrew Young International Boulevard and Ted Turner Drive against the green light and in the roadway. Pritchard Body Worn Camera at time stamp 21:05:42-21:06:09; Ward Body Worn Camera at time stamp 21:05:45 – 21:06:15.

19.

The following radio transmissions then occurred as provided by the audio from Harper's body worn camera:

> 21 05 26 Unknown male voice (shouting): Fuck you
>
> 21 05 28 Rock impact heard (click sound against glass)
>
> 21 05 28 Unknown male voice (shouting): Fuck you
>
> 21 05 32 Alright, units somebody just threw a rock at my vehicle. Did anybody see that? Anybody close by that saw that?
>
> Bruce: 21 05 38 This one in the middle of the street with a black hat thing. Guys, let's grab this one.
>
> 21 05 47 okay all units let's move in. I gave the dispersal order and somebody threw a rock at my vehicle. There's no need to wait for any time. Let's go ahead and move in.
>
> 21 05 58 Bruce: Let's start knocking them out, guys. Let's start making arrests.

21 06 04 Harper: 7201 to JOC the dispersal order has been given. Somebody threw a rock at my vehicle. We're going to move in and start making some arrests.

21 06 16 Bruce: The one who threw the rock is uh, I got my eyes on him. Just waiting on other people to get here with me.

21 06 30: Harper: Just to stress again, the dispersal order has already been given so everybody who we can see here on the sidewalk was in the street and they are subject to arrest.

21 07 20 Harper: 7201 to JOC the group has linked arms and they are trying to blockade us from putting hands on them.

21 07 54 Female voice: Do you have the person that threw the rock?

21 08 00 Harper: I believe 7200 has eyes on them.

21 08 03 Bruce: We got that one

21 0 09: Female voice: Do you have any other 78s[2]?

21 08 14 Harper: Okay for other officers out here, everybody that is in that group was in the street I gave them the dispersal order and they committed an act of violence against the police, so they can all go to jail. There is no need to discuss anything.

---

[2] A "78" is short for 10-78 which is police shorthand for a person in custody.

20.

The "Bruce" identified in the radio transmissions above refers to then-Captain, and now Deputy Chief, Jessica Bruce, who was the senior officer on the scene at the time of this protest. Deputy Chief Bruce is not a defendant in this action. Plaintiff' Exh. 1 at ICS p. 3; Bruce depo. p. 55, l.13 to l.14 .

21.

Following these events, Deputy Chief Bruce prepared a memorandum to her immediate superiors, Deputy Chief O'Connor and Major Watson, providing a summary of the events of that evening. Plaintiff's Exhibit 13.

22.

The decision to arrest is a discretionary act left to the choice of an individual officer based on all of the information known to the officer, including information received from other officers or superiors. Bryant deposition at p. 36, l.12 to p. 37, l.5.

23.

DC Harper did not physically arrest any Plaintiff. (See complaint, generally)

24.

On January 6, 2021, Officer Amanda Wortham was assigned to the Zone 3 precinct. Wortham deposition at p. 11-12, ln. 25, 1-11.

8

25.

During January 6, 2021, Officer Amanda Wortham was working her normal patrol in Zone 3 until she was sent to Zone 5 by her supervisor to assist with the protest. Wortham deposition at p. 14, ln. 1-17.

26.

At the scene, Officer Amanda Wortham observed a group of protestors slowly walking up the sidewalk with their arms interlocked. Wortham Body Worn Camera at time stamp 21:07:28 – 21:07:32; Wortham deposition at p. 19, ln. 3-10.

27.

Officer Amanda Wortham was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest. Wortham Body Worn Camera at time stamp 21:08:14 – 21:08:25.

28.

Officer Amanda Wortham arrested Plaintiff Lisa Baker.

29.

On January 6, 2021, Officer Chairman Saintil was assigned to the Zone 1 Crime Suppression Unit. Saintil deposition at p. 10, ln. 1-7.

30.

That evening, Officer Saintil was on standby for the protest and was staged in a police vehicle facing the Zone 5 mini precinct. Saintil deposition at p. 11, ln. 20-22, p. 15, 9-16.

31.

At the scene, Officer Saintil observed a group of protestors slowly walking up the sidewalk with their arms interlocked. Saintil Body Worn Camera at time stamp 21:07:16 – 21:08:07.

32.

Officer Chairman Saintil was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest. Saintil Body Worn Camera at time stamp 21:08:14 – 21:08:25.

33.

Officer Chairman Saintil assisted with the arrest of Plaintiff Timothy Buford.

34.

On January 6, 2021, Officer Sameeh Khatib was assigned to the Zone 1 Crime Suppression Unit. Khatib deposition at p. 12, ln. 21-25.

35.

That evening, Officer Sameeh Khatib was on standby for the protest and staged one block away from the location of the protestors. Khatib deposition at p. 15, ln. 1-9.

36.

At the scene, Officer Sameeh Khatib observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Khatib Body Worn Camera at time stamp 21:07:18 – 21:08:19.

37.

Officer Sameeh Khatib was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest. Khatib Body Worn Camera at time stamp 21:08:14 – 21:08:25.

38.

Officer Sameeh Khatib assisted with arrest of Timothy Buford and arrested Jessica Eichler.

39.

On January 6, 2021, Seargent Williams Skeens was a part of a discretionary unit that was notified there would be protests downtown that evening and was assigned to be on standby. Skeens deposition at p. 9, ln. 5-20.

40.

At the scene, Seargent William Skeens observed a large group of protestors walking in the roadway. Skeens deposition at p. 11, ln. 5-12.

41.

At the scene, Seargent William Skeens observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Skeens deposition at p. 20, 9-19; Skeens Body Worn Camera at time stamp 21:07:27.

42.

Seargent William Skeens was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest.  Skeens Body Worn Camera at time stamp 21:08:14 – 21:08:25.

43.

Seargent William Skeens arrested Plaintiff Rose Kendall.

44.

On January 6, 2021, Officer Jack Wright was assigned to the Zone 3 Crime Suppression Unit. Wright deposition at p. 9, ln. 10-20.

45.

That evening, Officer Jack Wright was assigned to Zone 5 to standby since there were going to be protests downtown. Wright deposition at p. 10, 5-16.

12

46.

At the scene, Officer Jack Wright observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Wright Body Worn Camera at time stamp 21:07:10 – 21:08:27.

47.

Officer Jack Wright was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest. Wright Body Worn Camera at time stamp 21:08:14 – 21:08:25.

48.

Officer Jack Wright assisted with the arrest of Siena Watchulonis and arrested Cassandra Ellerbee.

49.

On January 6, 2021, Officer Jasmyn Hawkins Mogavero was dispatched to the location of the protest. Hawkins Mogavero deposition at p. 10, 2-8.

50.

At the scene, Officer Jasmyn Hawkins Mogavero observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Hawkins Mogavero Body Worn Camera at time stamp 21:07:04 – 21:08:27.

13

51.

Officer Jasmyn Hawkins Mogavero was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest.  Hawkins Mogavero Body Worn Camera at time stamp 21:08:14 – 21:08:25.

52.

Officer Jasmyn Hawkins Mogavero assisted with the arrest of Cassandra Ellerbee and arrested Siena Watchulonis.

53.

On January 6, 2021, Officer Norman Faulkcon was dispatched to the location of the protest. Faulkcon deposition at p. 8, ln. 13-21.

54.

At the scene, Officer Norman Faulkcon observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Faulkcon Body Worn Camera at time stamp 21:07:00 – 21:08:27.

55.

Officer Norman Faulkcon was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest. Faulkcon Body Worn Camera at time stamp21:08:14 – 21:08:25.

56.

Officer Norman Faulkcon assisted with the arrest of Plaintiff John Peterson.

57.

On January 6, 2021, Officer Cadell Stevens was part of the Filed Investigation Team, who were assigned to standby for the protest occurring downtown. Stevens deposition at p. 11, ln. 3-8, 16-23.

58.

At the scene, Officer Cadell Stevens observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Stevens Body Worn Camera at time stamp 21:07:08 – 21:08:27.

59.

Officer Cadell Stevens was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest.  Stevens Body Worn Camera at time stamp 21:08:14 – 21:08:25.

60.

Officer Cadell Stevens assisted with the arrest of Plaintiff John Peterson.

61.

On January 6, 2021, Officer Kermit Ward was assigned to the Zone 1 Crime Suppression Unit and was assigned to the protest location. Ward deposition at p. 14, ln. 2-4, p. 20, ln. 19-21.

62.

Officer Kermit Ward heard DC Harper announce the dispersal order over the vehicle's public address system and observes the group of protestors in the street and crossing against a green light. Ward deposition at p. 21, ln. 1-8; Ward Body Worn Camera at time stamp 21:05:45 – 21:06:15.

63.

At the scene, Officer Kermit Ward observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Ward Body Worn Camera at time stamp 21:06:55 – 21:07:00.

64.

Officer Kermit Ward was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest.  Ward Body Worn Camera at time stamp 21:08:14 – 21:08:25.

65.

Officer Kermit Ward arrested Plaintiffs Heidi Howard and Mykah Knitig.

16

66.

On January 6, 2021, Officer Kensley Gachette was assigned to the Zone 3 Crime Suppression Unit and was assigned as a response team for the protests. Gachette deposition at p. 9, ln. 1-5.

67.

At the scene, Officer Kensley Gachette observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Gachette Body Worn Camera at time stamp 21:06:59 – 21:08:27.

68.

Officer Kensley Gachette was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest. Gachette Body Worn Camera at time stamp 21:08:14 – 21:08:25.

69.

Officer Kensley Gachette arrested Plaintiff Donovan Schilling.

70.

On January 6, 2021, Officer Tyler Davis was assigned to the Zone 1 Crime Suppression Unit and was assigned to the protest location. Davis deposition at p. 8, ln. 20-22.

71.

At the scene, Officer Tyler Davis observed a group of protestors moving slowly up the sidewalk with their arms interlocked. Davis Body Worn Camera at time stamp 21:07:03 – 21:08:27.

72.

Officer Tyler Davis was informed by DC Harper over the radio that the group was in the street, that DC Harper had given a dispersal order, that an act of violence was committed against police, and the group was subject to arrest.  Davis Body Worn Camera at time stamp 21:08:14 – 21:08:25.

73.

Officer Tyler Davis assisted with the arrest of Drew Mindell.

74.

On January 6, 2021, Officer Cadeem Pritchard was assigned to the Zone 2 and was dispatched to the protest location. Pritchard deposition at p. 10, ln. 16-22.

75.

Officer Cadeem Pritchard was informed by DC Harper over the radio that a dispersal order was given and observes the group of protestors in the street and crossing against a green light. Prichard deposition at p. 15-16, ln. 17-25, 1-6; Pritchard Body Worn Camera at time stamp 21:05:38 – 21:06:10.

76.

Officer Cadeem Pritchard assisted with the arrest of Malcolm Green.

77.

Five of the more than 20 defendant officers on scene did not observe any object being thrown by any of the protesters on the day in question. (Noziere p. 12) (Davis p. 16) (Davis p. 31) (Stevens p. 23) (Frasier p. 23).

75.

The object allegedly thrown was not a brick.

76.

Noziere saw the group being in the road (Noziere p. 13) Noziere assumed that individuals he arrested were in the roadway because they were part of the protest. (Noziere p. 14).

77.

Anything the officers knew about any criminal actions of the members of the group was obtained by them through collective knowledge and not by them witnessing it first hand. (Stevens depo. p. 23) When Jeremy Frasier arrived he did not observe the group engaging in any criminal behavior. (Frasier depo. p. 14-15, 23).

78.

After the dispersal order was given, the group was moving – not standing still. (Noziere depo. p. 16) (Stevens depo. p. 22) (Stevens depo. p. 76, 77) (Frasier depo. p. 20).

79.

At the time immediately before arrests the group was moving slowly. (Davis depo. p. 18, 36, 37).

80.

At the time of arrest and immediately before arrest the group was on the sidewalk. (Davis dep. p. 19) (Stevens depo. p. 21)

81.

The entire time Tyler Davis saw the protesters they were on the sidewalk. (Davis depo. p. 19).

82.

Marching from CNN Center to Woodruff Park is a common thing that happens in the City of Atlanta (Harper depo. p. 25)

83.

Gathering at Centenial Olympic Park was very typical for the protests at the time. (Harper depo. p. 107).

84.

Noziere had an understanding that as a police officer he was required to comply with Harper's order to arrest protesters. (Noziere depo. p. 18) Davis considered Harper's communication to be an order. (Davis depo. p. 29) Stevens understood that it was told to them that the people in that group were to go to jail. (Stevens depo. p. 28) His understanding was that he was told to go in and arrest those people. (Stevens depo p. 29) Officers were told to make arrests for pedestrian in the roadway and officer Frasier understood he had to comply with this order. (Frasier depo p. 18)

85.

The intent was to take the entire group into custody without people scurrying off. (Davis depo. p. 29)

86.

Gary Harper characterized his directive to arrest all protesters on the night in question as an "order." This is so because if he says it as a supervisor, it is considered an order. (Harper depo. p. 50, 61, 149)

87.

Normally Gary Harper is the one taking the lead at protests. Even though Jessica Bruce outranked him he assumed control at the time because he wrote the plan. (Harper depo. p. 163).

21

88.

An undercover officer was present at the protest. (Stevens depo. p. 78)

89.

An undercover officer would relay information about size of the crowd, description of the crowd, direction of travel of the crowd, weapons in the crowd, wanted people in the crowd, and any violent acts committed by people in the crowd. (Noziere depo. p. 22) Undercover officer is generally used to get inside information about the next moves of the protesters and things that they have planned, more so from a safety aspect for us, as well, to see if they're -- if they're armed, if they have weapons, if their -- if their plans are to do anything to hurt, harm or injure anybody. (Stevens depo. p. 79)

90.

It is not uncommon for APD to have an undercover officer at protests. Gary Harper knew that there was an undercover officer there on the day in question. (Harper depo. p. 161)

91.

The Civil Disturbance Unit was not on scene on the night in question. (Noziere depo. p. 31) (Davis depo. p. 61) (Frasier depo. p. 47).

22

92.

Officers present that night were not wearing CDU gear. (Davis depo. p. 61) (Stevens depo. p. 52)

93.

The Civil Disturbance Unit wears heavily armored gear that protects them from projectiles, closeup strikes from different types of weapons and physical strikes from others. This includes chest, arms, legs, head, and neck protection. This is something that only the CDU wears. (Davis p. 59) Civil disobedience unit is prepared for extreme violence that's committed against the officers with different types of weapons, chemical agents and otherwise. They have shields, as well. (Davis depo. p. 60) CDU has extra-padded vests, knee guards, leg guards, things like that. (Stevens depo. p. 51) Civil disobedience gear is the same thing as riot gear. (Stevens depo. p. 51)

94.

The CDU unit is the primary response to civil unrest where it gets to the point of either damage to property or harm to any other citizens or police officers. That is when the APD would activate the CDU. (Harper depo. p. 22)

23

95.

The CDU unit would be activated in any instance of violence towards any person, any damage to private or government property, entering onto the interstate, or setting vehicles on fire. (Harper depo. p. 22)

96.

The primary goal of the CDU unit is to remove the agitators from the crowd. (Harper depo. p. 23)

97.

The CDU can form a line or some kind of tactical formation to separate peaceful protesters from agitators. The officers can send in an arrest team to pick up those agitators and handle the situation there. (Harper p. 24)

98.

According to Gary Harper an agitator is an individual within a group who breaks away and does some kind of violence or damage to property. (Harper p. 25) An agitator is also someone who is trying to entice or encourage other people to do lawlessness. (Harper p. 26)

99.

"Extraction of protesters" is a technique where law enforcement would extract law breaking individuals from the group of protesters, bring them back

24

behind the front line, and then have the arrest teams make the arrest behind the front line. (Frasier p. 10-12)

### 100.

Severity of the crime affects discretion to arrest or not arrest. (Noziere p. 31-33) (Stevens p. 55-56) (Frasier p. 49, 52) Noziere never arrested somebody for running a red light. (Noziere p. 33)

### 101.

Noziere exercises discretion more often when it comes to misdemeanors than felonies (Noziere p. 34)

### 102.

If Frasier orders someone to get out of the street and they comply he does not arrest that person. (Frasier p. 53)

### 103.

According to Gary Harper there are times when APD lets people in the street. This is because it is not realistic to say you cannot be in the street when the sidewalk is not built for thousands of people to walk, so there are going to be some times when they spill in the street. (Harper p. 45) The APD has a traffic management role where sometimes Gary Harper has to make amends to let protesters continue on with their peaceful march or whatever they're doing and APD has to manage traffic. (Harper p. 45).

104.

According to Gary Harper officers are expected to exercise discretion not to arrest protesters even when they are in the roadway because "There is no sidewalk in Atlanta that can accommodate 30 people if they really -- if everybody feels they're important and they want to walk shoulder to shoulder, there's no sidewalk that can accommodate that." (Harper p. 125)

105.

If protesters intent is not to "disrupt the city"- such as operation of MARTA or emergency services Gary Harper would use the traffic control unit to control the flow of traffic rather than arrest the protesters. (Harper p. 125)

106.

Gary Harper believes that as an officer he is able to find a way to arrest somebody for anything he wants – even if they stop to tie their shoe in the middle of a sidewalk. (Harper p. 136)

107.

The protest group consisted of approximately 20 to 40 people. (Davis p. 12, 18)

108.

The group with which Tyler Davis arrived did what was called staging. They waited a short amount of distance away from where the protest was. Generally, that

was the protocol so as not to agitate the group. At that point they were just monitoring their radio. When Davis got there, he couldn't see the group of protesters. He couldn't see anyone from where he was specifically at. At the staging area they were not able to see the protesters yet.

109.

There were 30 to 40 police vehicles in the area at the time of arrests. (Davis p. 34) There were more law enforcement vehicles in the roadway than civilian vehicles (Davis p. 34) Davis did not perceive any danger to himself while being in the roadway on the night in question. (Davis p. 35)

110.

Law enforcement personnel understands Antifa to be more of an idea than an organization. (Davis p. 41) Antifa tends to participate in protests as agitators. (Davis p. 42) Agitator is someone who tries to incite a reaction (Davis p. 42) When they go out to a protest location and they're advised that antifa could be there, it was something to monitor for. They would look for agitators or added behavior to the crowd and monitor. (Davis p. 44) It was a conglomeration of people that would at times come to these events and agitate situations. (Davis p. 44) Antifa is known to be a protest group (Stevens p. 37). There are different chapters in different cities, and they represent one cause. (Stevens p. 38) Atlanta Police Department monitors Antifa. (Frasier p. 35)

111.

Antifa stands for antifascist. They were part of the 2020 protests. Members of Antifa have their flag and symbol. They dress all in black, hide their face, and carry fireworks. (Frasier p. 34)

112.

Gary Harper believes that some of the tactics that the officers saw on the night in question - specifically the black bloc - which is dressing similarly to avoid identification, is a tactic that he has seen used by the group known as antifa. (Harper p. 93)

113.

According to Gary Harper Antifa is a loose national group that may just be the theology of anti-fascism. They identify themselves as antifa at times. (Harper p. 83) Antifa has a very long history. The term antifa - short for anti-fascism - is what they would fall under as a group - supporting different causes at different times. (Harper p. 88) Gary Harper believes that Antifa should not be taken lightly. (Harper p. 89) Gary Harper believes that Antifa is associated with people being hurt or property being burned (Harper p. 90) and he has to use that information to craft his protest response plan. (Harper p. 90)

28

114.

Gary Harper claims it was likely that the group on the night in question had weapons because they looked like Antifa, wore backpacks, and law enforcement has seen weapons with Antifa before. (Harper p. 131)

115.

Chief Rodney Bryany believes Antifa to be a very active civil disturbance organization where they would oppose law enforcement that is sometimes volatile but not to the extent of using assault weapons or anything of that nature. (Bryant p. 17-18)

116.

The planning for protests that are expected to involve Antifa would generally be the same to handle them like any other protest. (Bryant p. 18)

117.

The group of protesters on the night in question looked like Antifa – although Jeremy Frasier is not sure if they were actually Antifa. (Frasier p.36)

118.

According to Gary Harper there are certain symbols that are affiliated with Antifa – namely the anarchist symbol has been affiliated with the group. It's an A in a circle with a specific marking. Another symbol is Extinction Rebellion which is Extinction Rebellion "more of an environmental arm of that group" and it has a

symbol that is an infinity symbol but in a triangular form and can be found in red and black and other colors. (Harper p. 94) Another Antifa symbol is the Guy Fawkes mask. (Harper p. 95)

### 119.

According to Jeremy Frasier, Antifa was involved in what happened in 2020 – specifically burning buildings. (Frasier p. 37)

### 120.

The individual Jeremy Frasier arrested was on the sidewalk at the time. (Frasier p. 23).

### 121.

The dispersal order is generally given in the same exact format every time and is generally read from a piece of paper so that it was concise and consistent every time. (Davis p. 51)

### 122.

Dispersal order was something typically given at all protests. (Frasier p. 18) Typically dispersal orders are given more than once before the arrests are starting to happen. (Stevens p. 31)

### 123.

Officers did not arrest protesters for violating the dispersal order. They arrested them for pedestrian in the roadway. (Frasier p. 22)

124.

Officers are aware of situations where dispersal orders have been read multiple times and five minutes have been given to people to disperse. (Frasier p. 41). The Dispersal Order that was included in the response plan prepared by Gary Harper is crafted in conjunction with City of Atlanta Law Department (Harper p. 123) to make sure that the verbiage is specifically something that law enforcement wants to say to convey the right message to the people who are violating certain laws. (Harper p. 124).

125.

The Quick Reference Guide within the incident response plan for the Solidarity With Kenosha protest at issue contained charges that are typically used at protests. (Frasier p. 45)

126.

It was Gary Harper's decision to include the Quick Reference Guide as part of the response plan in this case. (Harper p. 135) The reason for selection of the particular charges to be included in the Quick Reference Guide was that those are the common charges that Gary Harper expects to see at the protests. (Harper p. 136)

127.

City of Atlanta has a policy of allowing peaceful protesting. Officers are usually told to follow groups, let them voice their protest, and make sure that they are doing it in a peaceful manner. (Frasier p. 13)

128.

Typically if protesters are leaving law enforcement lets protesters leave. That's what law enforcement wants. Even if they're starting to cause problems and they're leaving – law enforcement would let them. (Frasier p. 24)

129.

The policy of the City of Atlanta is for the protest to continue while the agitators are being removed. (Harper p. 24)

130.

Gary Harper's protest response plans in conjunction with review from the Law Department is how APD moves forward on any of their response to civil unrest. (Harper p. 42)

131.

City Ordinance of Obstructing Traffic is one of the most common charges that is used at protests. (Harper p. 122)

132.

If you are in the street instead of the sidewalk and you are still moving and you are still peacefully protesting, then Gary Harper believes that he has to be able to allow you to do that because the sidewalks won't accommodate a group of any size. (Harper p. 142)

133.

Stevens really hasn't had too many situations where he could say - yeah, I'm going to take you to jail every time with using pedestrian in the roadway. It's more of a ticket. (Stevens p. 58)

134.

Gary Harper or one of the units under his command are materially involved in the planning of any protest activity that happens in the City of Atlanta and any large scale events. (Harper p. 14)

135.

According to Gary Harper the planning that goes into preparing for protests is as follows: Generally Gary Harper would receive intelligence through the Homeland Security unit or through the FBI or any other party that may have some information that there is a group planning to gather at a particular location to protest. The APD then has to gauge how many people do they think are going to

attend the protest, what is the APD response going to be, how to protect protesters' rights and try to minimize the impact on the citizens of Atlanta. (Harper p.18)

136.

Gary Harper is one of the most experienced individuals within the City of Atlanta Police Department when it comes to policing protests. He is the go-to guy when it comes to dealing with protests and he was that go-to guy back in 2020 already. (Harper p. 40)

137.

Nobody has written the number of protest plans that Gary Harper has. He has the most experience in writing those specific plans. (Harper p. 48)

138.

Gary Harper first learned that there was going to be a protest days before the protest. (Harper p. 63) He received a notification from Homeland Security Unit which scours social media looking for any protests and they scour the streets looking for any flyers on the street. (Harper p. 63) There are daily notifications from Homeland Security through City email (Harper p. 63) as well as a weekly summary. (Harper p. 64)

139.

William Ricker directed Gary Harper to prepare the response plan in this case. (Harper p. 74)

34

140.

Gary Harper has to craft a response plan for a protest based on what APD knows about the group who sponsored it (Harper p. 75)

141.

Gary Harper crafted his response plan at issue based on an expectation that hundreds of people are going to show up at the protest. (Harper p. 77)

142.

In preparation of his plan Gary Harper followed a form plan prepared according to the NIMS, which is the National Incident Management System. (Harper p. 77)

143.

Gary Harper crafted his response plan based on an assumption that Antifa was sponsoring this protest. (Harper p. 83)

144.

Gary Harper has to craft his protest response plan based on information that Antifa is associated with people being hurt or property being burned. (Harper p. 90).

145.

Auto Crimes Enforcement Unit was included into the response plan because it was a traffic control unit. Its role was to be prepared for the possibility that the protesters start moving in which case they would control traffic so that protesters wouldn't get hit. (Harper p. 108)

146.

Every supervisor on the scene was given a copy of a pre-written Dispersal Order by Gary Harper. (Harper p. 109)

147.

Atlanta Corrections had a transport bus on standby before the protest even started. (Harper p. 118)

148.

Gary Harper considered the protest in question to be a small protest. (Harper p. 119, 137) The number of law enforcement resources they had available for that protest was more than was needed. (Harper p. 119)

149.

The form dispersal order included in the response plan is a document that was drafted by the City of Atlanta Law Department. (Harper p. 127)

150.

According to Gary Harper the typical time given to individuals to comply with dispersal orders is three to five minutes – but if the crowd is particularly large

36

the dispersal order may have to be read several times. (Harper p. 129) If the crowd is particularly large protesters may have to be given longer time to disperse - such as 10 minutes. (Harper p. 130)

151.

Gary Harper agrees that protesters should be given enough time to comply with a dispersal order. (Harper p. 129)

152.

On the night in question the Dispersal Order procedure (including the time given to protesters to disperse) was not followed because an object was allegedly thrown by one of the protesters. (Harper p. 131, 132)

153.

Gary Harper claims that an object was thrown at his vehicle by one of the protesters and that this object was a rock. (Harper p. 131).

154.

According to Gary Harper the alleged throwing of the object meant that the group "no longer want[ed] to have a peaceful discussion about anything and [they] want[ed] to move on to the next level." (Harper p. 131)

155.

The language in the incident response plan that reads "If protesters attempt to take the street, we will immediately read the dispersal order and begin making

37

arrests." is a result of a policy change of the City of Atlanta that is "a shift in what it was before". (Harper p. 141) The idea was to start a stricter enforcement of the already existing laws. (Harper p. 142

### 156.

Taking the street means that you are now trying to gain control of an intersection or a city street to prevent normal business from occurring. (Harper p. 142)

### 157.

The only other specific instances from protests where Gary Harper remembers issuing an order to conduct a mass arrest of "all protesters that you see" were instances where a group sat down in the intersection, and they had people lined up around them as a barricade to protect the people who were sitting down in the street from being arrested. (Harper p. 150)

### 158.

On the night in question Gary Harper was in an unmarked vehicle. (Harper p. 157)

### 159.

Gary Harper observed protestors gathering at the corner of Centennial Olympic Park and Marietta, have a little talk and light some candles. (Harper p. 158)

160.

Gary Harper observed protestors gathering at the corner of Centennial Olympic Park and Marietta, have a little talk and light some candles. (Harper p. 158)

161.

After protesters started moving, Gary Harper would be driving on parallel streets such as Cone or Ted Turner. (Harper p. 167)

162.

With regards to the alleged object that was thrown at Gary Harper's vehicle, Gary Harper did not see the person that threw it, Gary Harper only heard a noise of something striking a vehicle. (Harper p. 170)

163.

By the time Gary Harper gave a dispersal order protesters started moving to the sidewalk. (Harper p. 171)

164.

Gary Harper's body cam video begins at 21:02:29 on the night of January 6, 2021. At that time Gary Harper is in his vehicle driving northbound on Centennial Olympic Park Drive. At 21:02:38 he makes a right turn on to Marietta Street. At 21:02:52 he makes a left turn on to Ted Turner Drive. At 21:03:02 he crosses Walton Street – still traveling northbound on Ted Turner. At 21:03:12 he crosses Luckie Street – still Traveling northbound on Ted Turner. At 21:03:28 he arrives at

the intersection of Ted Turner and Carnegie Way. He continues northbound to the intersection of Andrew Young International and Ted Turner where he slows down and pulls slightly to the left against the curb at 21:03:38. He then comes to a complete stop at the intersection of Andrew Young International and Ted Turner at 21:03:42. At 21:04:20 Gary Harper starts moving his vehicle again. At 21:04:25 he makes a left turn on to Andrew Young International from Ted Turner. He continues slowly towards the intersection of Andrew Young International and Carnegie Way and comes to a stop just before the "Stop Here on Red" sign at 21:04:37. At this time Gary Harper states over the megaphone: "I am Lieutenant Harper." At 21:04:44 Gary Harper begins reading a dispersal order. (Gary Harper BWC; Harper p. 177-182)

165.

The dispersal order Gary Harper read at 21:04:44 was the first and only dispersal order Gary Harper read that night. (Harper p.183)

166.

Gary Harper appeared to read from the form dispersal order included in the response plan but failed to read the last paragraph that would advise protesters how much time they have to exit the roadway. (Harper p. 183; Harper BWC 21:04:44 – 21:05:18)

167.

The dispersal order Gary Harper read ordered the protesters to exit the street and did not order them to leave the area. (Harper BWC 21:04:44 – 21:05:18)

168.

Protesters complied with Gary Harper's dispersal order. (Harper p. 171)

169.

Nine seconds after Gary Harper completed his reading of the dispersal order (at 21:05:27) a smacking sound is heard on the body worn camera belonging to Gary Harper. Gary Harper claims that this is a sound of an object striking his vehicle. He also claims that this object was thrown by one of the protesters. (Harper BWC 21:05:27; Harper p. 170, 184)

170.

At 21:05:46 or 28 (twenty eight) seconds after reading of the dispersal order Gary Harper orders the arrest of all protesters by stating: "Okay – all units – let's move in. I gave a dispersal order and someone threw a rock at my vehicle. There is no need to wait for any time. Let's go ahead and move in." (Harper BWC 21:05:46)

171.

At 21:05:58 Jessica Bruce states to the officers: "Go ahead and start knocking them out guys. Start making the arrests." (Harper BWC 21:05:58)

41

172.

At 21:06:29 Gary Harper repeats his arrest order by stating: "Just to stress again – the dispersal order has already been given – so everybody who we can see here on the sidewalk was in the street and they are subject to arrest." (Harper BWC 21:05:58)

173.

What Gary Harper meant by saying "there is no need to wait for any time" was that officers did not need to wait to give protesters time to disperse – but can instead start arresting immediately. (Harper p. 188)

174.

On the night in question there were at least 25 or 30 officers present on the scene. (Harper p. 199)

175.

From 21:09:00 through 21:17:00 Gary Harper encounters several individuals that are either standing in the street or walking in the street but does not arrest them or order anyone to arrest them. (Harper BWC 21:09:00 – 21:17:00)

176.

As to one of the non-protester individuals that Gary Harper observed in the roadway he stated that he wanted to give "people a little bit of leeway, as much as I

can, because that person was going to jump back in that car and be gone." (Harper p. 200)

177.

Lieutenant Burks was in charge of the arrest team – which was the team responsible for writing the arrest citations. In a mass-arrest situation, officers pre-fill out some portions of the ticket. (Harper p. 205) In this case Gary Harper stated to officers that "everybody that you see here in this group" was in the roadway – which dictated what charge officers had to write in the citations. (Harper p. 206)

178.

At 21:16:08 Gary Harper spoke on the phone with Major Watson and states that he gave the protesters "two minutes on the dispersal order." (Harper BWC 21:16:08; Harper p. 212)

179.

After inspection of his vehicle Gary Harper did not observe any new damage – that is to say: no damage attributable to any object striking his vehicle on the night in question. (Harper p. 214; Harper BWC 21:21:41 – 21:23-47)

180.

At 21:21:41 Gary Harper begins talking to a superior officer that he addresses as Major. He reports to that superior officer that "a couple of rocks got thrown at [Gary Harper's] vehicle." Gary Harper also reports that protesters "jumped on the

sidewalk while I was giving the dispersal order and then immediately afterwards they just walked right back out in the middle of the street." (Harper BWC 21:21:41 – 21:23-47)

### 181.

After all the arrests were completed Gary Harper ordered officers to look for other protesters in the area. This was done in the following manner: Police was looking for anyone that is committing any type of crime. After such an individual would be encountered by the police they would then be detained and a determination would be made as to whether they are affiliated with the protest group. (Harper p. 206 – 207).

### 182.

Gary Harper was present at the location of a Stop The Steal Protest at the Georgia State Capitol on December 12, 2020.

### 183.

The reason for Gary Harper being present at the location of a Stop The Steal Protest at the Georgia State Capitol on December 12, 2020 was that Gary Harper's unit with Atlanta Police received information that a large protest was scheduled at the State Capital on Washington Street, and adjacent to Historic City Hall for the City of Atlanta and City of Atlanta Police Officers were requested to assist with control of the situation.

184.

Some protesters at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020 were armed.

185.

Some protesters at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020 were in the roadway.

186.

During the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020 the road had been blocked by Georgia State Patrol allowing people to be in Washington Street. The Georgia State Patrol has primary authority and jurisdiction over the streets immediately adjacent to the State Capital.

187.

Gary Harper did not arrest anyone at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020

188.

Gary Harper is not aware any arrests being made at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020.

189.

Gary Harper had a leadership role within the City of Atlanta Police Group present at the at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020.

190.

No arrests at all were made at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020 of any person for any crime.

191.

Gary Harper had conversations with protesters at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020.

192.

Gary Harper fist bumped a protester at the Stop The Steal Protest at the Georgia State Capitol on December 12, 2020.

This 14th day of July, 2025.

<table>
<tr>
<td>

s/Drago Cepar, Jr.
Drago Cepar, Jr.
Georgia Bar No. 142362

1900 The Exchange
Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dragoceparlaw@gmail.com

Attorney for Plaintiffs

</td>
<td>

/s/ Christopher D. Balch

Christopher D. Balch
BALCH LAW GROUP
830 Glenwood Avenue
Suite 510-220
Atlanta, GA 30316
(*Attorney for Defendant Harper*)

</td>
</tr>
</table>

## <u>CERTIFICATE OF TYPE FACE COMPLIANCE</u>

In accordance with Local Rules 5.1(C) and 7.1(D), the undersigned certifies that the within and foregoing document was prepared utilizing Microsoft Word in Times New Roman 14 point type.

This 14th day of July, 2025.

*/s/ Christopher D. Balch*
Christopher D. Balch
Georgia State Bar No. 034015

**BALCH LAW GROUP**
830 Glenwood Ave., SE
Suite 510-220
Atlanta, GA 30316
chris@balchlawgroup.com
404/202-5934

## CERTIFICATE OF SERVICE

I hereby certify that the within and foregoing document was served upon all

counsel of record through the Court's ECF/CM system to the email addresses of

record for each counsel as follows:

| | |
|---|---|
| Drego Cepar, Jr. | David Ware |
| 1900 The Exchange | Phil Friduss |
| Suite 490 | Hall Booth Smith |
| Atlanta, GA 30339 | 191 Peachtree Street |
| 770/940-3233 | Suite 2900 |
| dcepar@gmail.com | Atlanta, GA 30303 |
| | 404/ |
| | dware@hallboothsmith.com |
| | pfriduss@hallboothsmith.com |
| | |
| Thomas M. Mitchell | Karen Woodward |
| Mary Minter | Edward Greenblat |
| Carothers & Mitchell, LLC | Cruser, Mitchell Novitz Sanchez |
| 1809 Buford Highway |    Gaston & Zimet LLP |
| Buford, GA 30518 | Meridian II |
| 770/932-3552 | 275 Scientific Drive |
| Thomas.mitchell@carmitch.com | Suite 2000 |
| | Norcross, GA 30092 |

This 14th day of July, 2025.

/s/ Christopher D. Balch
Christopher D. Balch
Georgia Bar No. 034015

Balch Law Group
830 Glenwood Ave., SE
Suite 510-220
Atlanta, GA 30316
404/202-5934
chris@balchlawgroup.com