IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA BAKER, et al.,          )
                             )
    Plaintiffs,              )
                             )   CASE NO. 1:21-cv-04186-MLB
    vs.                      )
                             )
CITY OF ATLANTA,             )          **ORIGINAL**
et al.,                      )
                             )
    Defendants.              )

- - -

Deposition of
SIENA WATCHULONIS

Monday, October 23, 2023
12:55 p.m.

Hall Booth Smith
191 Peachtree Street, Northeast
Suite 2900
Atlanta, Georgia

MARY K. CALDWELL, CSR, B-1325
------------------------------------------------------------

PRECISION REPORTING, INC.
Certified Shorthand Reporters
125 Chardonnay Oaks Drive
McDonough, Georgia  30252
770-786-9664
precisionreportinginc@gmail.com
www.precisionreporting.net

2

### INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Mitchell | 4 |
| Examination by Mr. Balch | 118 |
| Further Examination by Mr. Mitchell | 126 |
| Examination by Mr. Cepar | 129 |

### INDEX TO EXHIBITS

Defendant's
Exhibit No.                                              Page

Exhibit 2     Photograph                                   77

Exhibit 3     Photograph                                   91

Exhibit 4     Photograph                                   92

Exhibit 5     Photograph                                   92

Exhibit 6     Photograph                                   93

Exhibit 7     Photograph                                   94

Exhibit 8     Photograph                                   94

Exhibit 9     Photograph                                   94

Exhibit 10    Photograph                                   95

Exhibit 11    Photograph                                   95

Exhibit 12    Plaintiff Siena Watchulonis' Response        15
              to Defendant Jasmyn Hawkins' First
              Interrogatories to Plaintiff

Exhibit 13    Resume                                       28

(Original Exhibits 2 through 13 were attached to original transcript.)

3

APPEARANCES OF COUNSEL:

ON BEHALF OF THE PLAINTIFFS:

DRAGO CEPAR, JR., ESQ.
P.O. Box 725192
1900 The Exchange
Suite 4900
Atlanta, Georgia  30339
dcepar@gmail.com


ON BEHALF OF DEFENDANTS DEJONGE, DENNINGER, FRASIER, HOGAN, MALSKIS, NOZIERE, PEARSON AND WALKER:

EDWARD B. GREENBLAT, ESQ.
Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet
Meridian II, Suite 2000
275 Scientific Drive
Peachtree Corners, Georgia  30092
egreenblat@cmlawfirm.com




ON BEHALF OF DEFENDANT HARPER:

CHRISTOPHER D. BALCH, ESQ.
Balch Law Group
830 Glenwood Avenue
Suite 510-220
Atlanta, Georgia  30316
chris@balchlawgroup.com




ON BEHALF OF DEFENDANTS WORTHAM, WRIGHT, WARD, KHATIB, SKEENS, HAWKINS, FAULKCON, STEVENS, PRITCHARD, GACHETTE, DAVIS AND SAINTIL:

THOMAS M. MITCHELL, ESQ.
MARY MINTER, ESQ.
Carothers & Mitchell
1809 Buford Highway
Buford, Georgia  30518
thomas.mitchell@carmitch.com
mary.minter@carmitch.com

4

DEPOSITION OF SIENA WATCHULONIS

PROCEEDINGS

(Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, the court reporter disclosure statement is tendered at the end of the transcript.)

MR. MITCHELL:  You want to swear the witness?

COURT REPORTER:  Ma'am, would you raise your right hand, please.  Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

SIENA WATCHULONIS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MITCHELL:

Q    Would you state your full name for the record, please.

A    Siena Elizabeth Watchulonis.

MR. MITCHELL:  This will be the deposition of Siena Watchulonis, taken in the case of Baker and others versus --

Let me see what it is.

PRECISION REPORTING, INC.
(770) 786-9664

5

MR. CEPAR:  Versus the dismissed client.

MR. MITCHELL:  -- City of Atlanta and others.  It's taken pursuant to Notice and agreement of counsel as to time and location, pursuant to the Federal Rules of Civil Procedure.

The normal stipulations, in addition to which in the previous deposition it was agreed that a dep -- an objection by one Defendant's counsel would stand for all Defendants, is that still acceptable?

MR. CEPAR:  That's agreed.  Yes.

MR. MITCHELL:  Okay.

BY MR. MITCHELL:

Q   Ms. Watchulonis, my name is Thomas Mitchell.  And I represent some of the officers that were involved in the arrest of you and Ms. Ellerbee and others on January 6, 2021.  Specifically, I represent the officers -- I think there were three of them involved in your arrest, so I've got some questions about the events of that night and things that have happened since and what-have-you.

Have you ever given deposition testimony before?

6

A    No.

Q    Okay.  It is not my intent to ask you anything tricky or uncertain.  I'm hoping to get just information about what your view is and what you witnessed.

If I ask you a question and you don't understand it, if you'll let me know that, I'd be happy to repeat it or rephrase it.

If you give me an answer, I'm going to presume you understood my question.

Is that fair?

A    Yes.

Q    Okay.  We have a court reporter here, and she's taking what's called a verbatim transcript of everything we say.  So if we talk over one another, then that's what it's going to look like in the transcript.  It makes it harder for the lawyers to use it.

So, if you will, try to wait until I'm done with my question, even if you can anticipate what I'm asking, until I'm done.  And I will try to wait 'til you're done with your answer.

Fair enough?

A    Yes.

Q    Okay.  Because of that, I'll also ask you

to give verbal responses, a yes or a no rather than a nod or a grunt.  There will be times, especially as we get later in the deposition, which you may forget that and I may say is that a yes or is that a no.  And I'm not trying to be rude.  I'm just trying to get a clear response.

Okay?

A     Okay.

Q     You have the right to review the deposition before it's used.  You can either reserve that right or waive that right.

What would you like to do, or you can wait 'til the end and decide then?

A     I would like to see it, please.

Q     Okay.  Have you --

Are you under the influence of any medication or any substance that may make it difficult for you to give truthful testimony today?

A     No.

Q     Are you under the influence of any type of substance or medicine that makes it difficult for you to remember the events especially from January of 2021?

A     No.

Q     Do you have any medical or mental

8

condition that makes it difficult for you to give truthful testimony?

A     No.

Q     Same question with regard to:  Do you have a medical or mental condition that makes it difficult for you to remember the events of January 2021?

A     No.

Q     Okay.  What did you do to prepare for your deposition today?

A     I talked with my lawyer.  And I -- a while ago, when we were doing the paperwork, I read my deposition [sic] right before we submitted it just to make sure for one last time that everything was correct and looked good to me.

Q     When you say your deposition, what are you referring to?

A     The Interrogatories --

Q     Okay.

A     -- that I answered.

Q     And I'll show those to you in a little bit.

A     Okay.

Q     Did you review any video in preparation for your deposition?

9

A    I don't believe so, no.

COURT REPORTER:  Can you speak up a little, please.  I'm sorry.

THE WITNESS:  Oh.  Sorry.

A    No, I did not.

BY MR. MITCHELL:

Q    Have you seen --

Have you ever seen any video of the events that night?

A    Yes.

Q    What video have you seen?

A    I watched one on YouTube, a, like, summary of the events.

Q    Is that a YouTube video that's approximately 17 minutes long, has a narrator and a collection of body-worn camera and other video footage?

A    That sounds right.

Q    Is that something that was put together by Michael Watchulonis?

A    I believe so.

Q    Okay.  And what is your relationship to Michael Watchulonis?

A    He's my father.

Q    How long ago was it that you reviewed that

10

video?

A    I'm not sure, but it wasn't very recent.

Q    Has it been within the last year?

A    Maybe.

Q    How many times have you seen it?

A    Maybe twice.

Q    Have you seen any footage from police officers' body-worn cameras, other than what's in that YouTube video?

A    I don't believe so.

Q    Other than your attorney, who I don't want to know what you discussed with, did you talk with anyone else in preparation for your deposition today?

A    No.  Well, does that consider, like, telling my parents where I was going because I'm coming right from school?

Q    So you let your parents know you'd be coming here after school?

A    Yes.

Q    And is that the extent of the conversation you had?

A    Um-hum.

Q    Is that a yes?

A    Yes.

Q   And when you refer to your parents, is that Michael Watchulonis --

A   Yes.

Q   -- who's your father?

Who's your mother?

A   Vicki Watchulonis.

Q   And I'll get some more details about that in a little bit.

You did not review any documents in preparation for your deposition today?

A   I don't believe so.

Q   Did anybody read you anything in preparation for your deposition today?

A   No.

Q   Even if it wasn't done in preparation for your deposition, have you talked with Michael Watchulonis about the events of that night?

A   Yes.

Q   He was there; correct?

A   Correct.

Q   In fact, he was also taking video that night; correct?

A   Yes.

Q   Have you seen the entirety of the footage that he made that night?

12

A    No.

Q    You've just seen the edited version that was posted on YouTube?

A    Yes.

Q    What was your conversation --

When was the last time you talked with your father about what happened that night?

A    Not very recently.

Q    When you say that, what does that mean?

A    I'm not sure, but probably in the last year.

Q    And what did you-all discuss?

A    Mostly how hard it was for him as a parent to watch me be thrown on the ground and arrested in front of him.

Q    Is that the first time that had happened?

A    That I've been arrested?

Q    Yes.

A    Yes.

Q    Had you been to other protests?

A    I don't recall, but possibly.

Q    How soon -- did you --

In the, let's say, week after the January 6, 2021, incident, did you talk with your father in that week afterwards?

SIENA WATCHULONIS - October 23, 2023

13

A   About what had happened?

Q   Yes.

A   I believe so, probably.

Q   Did you know that he was there that night?

A   Yes.

Q   Did you know that he was taking video that night?

A   Yes.

Q   In the event that we have to try this case, the jury will be pulled from a number of counties around the Atlanta area.

So I'm going to read you a list of counties, and my question for each one of those is do you have any relatives over the age of 18 that live in that county.

Okay?

A   I might not know the answer to all of that, then.

Q   All right.  Well, if you don't know, that -- I mean, that's fine.  All I can do is ask what you know.

A   Okay.

Q   Cherokee County?

A   I don't know.

Q   Clayton County?

14

A     Probably no.

Q     Cobb County?

A     Maybe.

Q     What would be the last names of relatives that live in Cobb County?

A     I don't know.

Would you like me to --

Do I have to give you what I think?

Q     If you -- if you have a fair recollection of what their names is, that would be helpful.

A     I don't know if they've been married and changed their names.

Q     Okay.  What's the relationship?

A     My mother's extended family.

Q     What about DeKalb County?

A     Likely no.

Q     Douglas County?

A     I don't know.

Q     Fulton County?

A     I don't know.

Q     Gwinnett County?

A     Likely no.

Q     Henry County?

A     Likely no.

Q     Newton County?

15

A    Maybe.

Q    And what would their names be?

A    Her previous last name was Rothermel.

Q    Can you spell that?

A    Maybe.  R -- sorry.

R-O-T-H-E-R-M-E-L (spelling) would be my best guess.  I don't really talk to my mother's side of the family.

Q    What about Rockdale County?

A    Probably no.

Q    And what county do you live in?

A    Gwinnett.

Q    And you live there with your parents?

A    Yes.

(Thereupon, marked for identification purposes, Defendant's Exhibit 12.)

BY MR. MITCHELL:

Q    Let me show you what's previously been marked as Exhibit No. 12.

Can you identify that document for me?

A    This is the Interrogatories that was submitted on my behalf by my attorney.

Q    Okay.  Have you ever been known by any other names or had any nicknames?

SIENA WATCHULONIS - October 23, 2023

16

A     As a child I had nicknames from my parents.

Q     Have you --

Have any of those nicknames been used since you've become an adult?

A     No.

Q     Your father doesn't have a name that he still uses for you that he used for you when you were younger?

A     No.

MR. MITCHELL:  All right.  Let's go off the record for just a second.

(Thereupon, a discussion was held off the record.)

MR. MITCHELL:  Thank you.  Back on the record.

BY MR. MITCHELL:

Q     The year of your birth is ███?

A     Correct.

Q     And the last four of your Social is ███?

A     Correct.

Q     All right.  Where were you born?

A     In Atlanta, or in, like, the suburbs.  I don't know what hospital.

Q     Well, like most children born in Atlanta,

17

you were probably born at Northside.

Do you know?

A    I'm pretty sure my sister was born at Northside.

Q    Okay.

A    But I think I may have been born somewhere else.

Q    What is your current address?

A    ███████████████████████████████.

Q    And how long have you-all lived at that address?

A    Since I was about a month old, I've been told.

Q    So that's the only home you've ever known other than school and --

A    Correct.

Q    Which high school did you graduate from?

A    The Gwinnett School of Mathematics, Science and Technology.

Q    Is that the one in Peachtree Corners?

A    It's in Gwinnett, but maybe.  It's -- Gwinnett is very large.

Q    Is that the one that's called the Paul Duke?

A    No.

18

Q    That's different?

A    It's abbreviated to GSMST.

Q    Okay.  Does anyone live there other than you and your parents?

A    My younger sister.

Q    How old is she?

A    18.

Q    What is her name?

A    Merida, M-E-R-I-D-A (spelling), Watchulonis.

Q    Is she in school?

A    No.  She graduated high school.

Q    Is she in college?

A    No.

Q    Is she working?

A    No.

Q    Just hanging out at home?

A    Yeah.

Q    Any other siblings?

A    No.

Q    Michael.  And you said Victoria?

A    Vicki.

Q    Vicki.

A    Um-hum.

Q    How does she spell Vicki?

19

A   V-I-C-K-I (spelling).

Q   What does Mr. Watchulonis do for a living?

A   He is an independent film maker and a journalist.

Q   What kind of films does he make?

A   Oftentimes, documentaries about nature or whatever he's contracted to do.

Q   Has he ever done anything that ran in theaters or was picked up by a streaming service?

A   Yes.

Q   Can you --

Do you remember any of those?

A   Wild Pacific, I believe, was on Amazon and Netflix and probably some other streaming services, too, and something called Cryptopia -- no, just kidding, sorry -- Bitcoin:  The End of Money As We Know It, not Cryptopia.

Q   That's what he calls it?

A   I think that's another documentary. Sometimes I get them confused.

Q   Okay.  Is that what he's done as long as you can remember?

A   Yes.

Q   What does your mom do?

A   She works at a Primrose School.

20

Q    In Gwinnett?

A    No.  It's one in the city.

Q    When you say "the city," you mean Atlanta?

A    Yes.

Q    Do you have any military experience?

A    No.

Q    Are you currently married?

A    No.

Q    Have you ever been married?

A    No.

Q    Do you have any children?

A    No.

Q    You do have a Georgia driver's license?

A    I do.

Q    Any restrictions?

A    No.

Q    What social-media accounts do you have?

A    I have an Instagram account that I don't use and a Snapchat that I don't use.

And I think that's all.  I don't use social media.  I don't like it.

Q    What's your Instagram name?

A    I believe it's A, underscore, beautiful, underscore, creature.

Q    Do you have a YouTube channel?

21

A    I believe I have a private one that I posted a few videos I made when I applied for scholarships to go to college, but I don't post on it anymore.

Q    I found one, and it was -- you were asking for some scholar -- you were giving background about your arthritis and doing --

A    Yes.  It was that one --

Q    Okay.

A    -- and maybe one more that might be private, but it's very similar.

Q    Okay.  You have a cell phone?

A    I do.

Q    What kind of cell phone do you have today?

A    An iPhone 8.

Q    Does that happen to be the same one you had on January 6, 2021?

A    I believe so.

Q    If it's not, would you have also had an iPhone in January of 2021?

A    Yes.

Q    Okay.  Do you still --

Assuming that it was a different phone, would you still have that phone that you had in January of 2021 or would you have traded it in to

SIENA WATCHULONIS - October 23, 2023

22

get a new one?

A    I would not have traded it in, but I don't know.  It's probably in a junk drawer somewhere.

Q    All right.  Did you take any photos or video on January 6, 2020 [sic]?

And I'm not just talking about the incident.  I'm talking about any time during the day.

A    I don't believe so.

Q    Did you -- did you look at your accounts and what-have-you in responding to discovery to see if you had any pictures or video from that day?

A    Yes.  And I did not find any.  I don't post on social media.  And I didn't find any photos when I looked back.

Q    What is your cell phone number?

A    ███████████.

Q    Did you have any text exchanges with anyone on January 6, 2021?

A    The entire day?

Q    Yes.

A    Likely.

Q    Did you -- did you review your texts to see if you had any that revolved around the vigil or the march that night?

23

A   I did not find any because I don't keep my messages past about a month because I don't want to pay for extra storage in the iCloud.

Q   Okay.

A   So I delete off.

Q   So you did look, but there's nothing there that you found?

A   Yes.

Q   Do you attend a church?

A   I used to.

Q   When was the last time you --

Well, I say church.

Do you attend a religious institution?

A   I used to.

Q   Which one?

A   St. Bartholomew's Episcopal Church of Atlanta.

Q   When was the last time you attended St. Bart's?

A   Before COVID, so --

Q   Were you a confirmed member of the Episcopal Church?

A   No.

Q   Did you --

Is that where your parents went?

24

A    We were previously Presbyterian, but we changed.

Q    Do you belong to any other organized clubs or associations?

A    Probably a few through my school.

Q    Such as?

A    Students interested in medicine or -- I don't know the exact name of all of the clubs; but they would revolve around medicine, healthcare, volunteering.

Q    What volunteering organizations?

A    In high school I volunteered independently, but currently I volunteer to pick up a -- groceries and help get them to the community.

Q    Is that a particular neighborhood that you serve or is it an organization that serves a number of neighborhoods?

A    I help pick up food from the Urban Recipe in Atlanta.  And it's a big food-bank distribution where really anyone can register to pick up food and take it to their local communities.

Q    And what community do you serve?

A    One that is around the church that allows us to keep food there.

Q    Which church is that?

25

A     I believe it's Mount Welcome.

Q     Outside of school, any other -- and this volunteer organization, any other clubs or organizations that you're involved with?

A     I don't believe so.

Q     What about on January 6 -- or back in January of 2021, were there any clubs, associations, organizations that you were a member of?

A     I can't recall but likely something similar to the ones I talked about before, about volunteering, healthcare, stuff like that.

Q     When did you graduate from high school?

A     May of 2020, I believe.

Q     So you graduated when we were in the midst of lockdown?  It was that year?

A     Correct.

Q     And you're attending college now?

A     Yes.

Q     You're at Georgia Tech?

A     Correct.

Q     Have you attended any other colleges?

A     I attended Georgia State for -- in my freshman year.

Q     Was that some sort of dual enrollment or was it just GSU and then you transferred?

26

A    I had a transfer to Georgia Tech, assuming that I got very good grades my first year at Georgia State.  And it just automatically transferred me over.

Q    When do you anticipate getting your degree?

A    In May of -- this upcoming May.

Q    May of '24?

A    Correct.

Q    Any plans for postgraduate work?

A    Ideally.

Q    What's the ideal?

A    A Master's in bioinformatics or a Master's of science communication or something like that that would allow me to be a genetic counselor.

Q    The video indicated that you -- you've got a diagnosis of some sort of osteoporosis or arthritis; correct?

A    Correct.

Q    And so part of what your life goal is is to work in some way to help people who have that same condition; correct?

A    Yes.  It's one of the reasons my major is neuroscience.  Neuromuscular disorders are of a special interest to me, especially as someone who

has not something very similar but who understands the struggle.

Q    Have you applied to a graduate program yet?

A    No.

Q    Have you taken the GRE or whatever the equivalent exam is?

A    No.

Q    Any other --

I know you're young, but any other formal training or education?

A    I don't believe so.

Q    Do you have any licenses or certifications, like --

A    I --

Q    -- a pilot's license or real estate license or anything like that?

A    I have a few CITI certifications.  And that's stuff around -- involving certifications to be able to work with animals, data management, stuff like that that you would need to work in a laboratory capacity.

Q    And did you say CITI certifications?

A    I believe it's C-I-T-I or C-I-T-T-I (spelling).  It's abbreviated.

Q    And how did you --

What did you have to do to get those certifications?

A    You have to pay for them normally or Georgia Tech pays for, like, a group service for anyone who's involved with a lab.  You can sign in. And the person you work under can assign you certifications to take.  And you work through a bunch of online modules, and you complete tests, and then you get an online certification.

Q    Are you currently working in a lab?

A    Yes.

Q    Which lab?

A    The Bellamkonda-Mokarram lab at Emory.

Q    And what is the focus of that lab's work?

A    It's cancers and biomaterials, I believe.

It should be on the resume that I submitted, the formal name of the lab.

COURT REPORTER:  This is 13.

MR. MITCHELL:  Yes, ma'am.  Thank you.

(Thereupon, marked for identification purposes, Defendant's Exhibit 13.)

BY MR. MITCHELL:

Q    Let me show you what we've marked as

29

Defendant's Exhibit 13.

Is that the resume that you're talking about?

A    Yes.

Q    And that resume that we've marked as Defendant's Exhibit 13 is current as of what day?

A    Let's see.  Several months ago.

I just started working in this lab, so it's actually not on my resume yet.

Q    Okay.

A    But I believe it's on my Indeed.  I just haven't made it a new job yet, so I didn't update it.

Q    Have you given any thought to what schools you'll get your Master's from?

A    I would like to go back to Georgia Tech or possibly Emory.

Q    Do you plan to go -- start in the fall of '24 or do you plan to take a year or two off?

A    I plan to take a few years in between.

Q    What do you plan to do in the meantime?

A    I would like to work as a research coordinator and help manage clinical trials.

Q    Have you -- what institution --

Have you given any thought to what

30

institution to work at?

A    Any hospital around Atlanta or several hospitals partner with Emory, like, the Winship Cancer Institute, CHOA, something like that.

Q    Other than this lawsuit, have you ever been party to any other lawsuit?

A    No.

Q    I asked you if you had given deposition testimony before, and you said no.

Have you ever testified in any court proceeding before?

A    No.

Q    Had you ever been arrested prior to January 6, 2021?

A    No.

Q    Have you been arrested since January 6, 2021?

A    No.

Q    Have you ever been stopped for any traffic violations?

A    As in, pulled over?

Q    Yes.

A    Yes.

Q    How many times?

A    Once that I can remember.

31

Q    And what was the charge or the citation?

A    I didn't get a citation.  Because one of my brake lights was out, and I didn't know.  I got a warning to fix it.

Q    So the brake lights and the January 6, 2021, is -- are those the only two personal encounters you've ever had with law enforcement?

A    I did get into an accident, and we had to call the cops.

Q    When was that?

A    It's in the packet because I paid the fine for improper lane change.

Q    So you listed that in your discovery responses?

A    Yes.

Q    Okay.

A    It has, like, the case number.

Q    Do you recall what you were charged with with regard to January 6, 2021?

A    I believe it was pedestrian obstruction of traffic.

Q    What was ultimately the disposition of those charges?

A    They were dismissed.

Q    Did you have to go to court?

32

A    Yes.

Q    Were you represented by counsel?

A    Yes.

Q    Who represented you?

A    Mr. Cepar.

Q    Do you know any of the other people that were arrested that night?

A    A couple people.

Q    Who do you know?

A    I know John Peterson and a Malcolm Green.

Q    Any others?

A    Not that I can recall.

Q    Of the folks that were arrested, had you seen any of them before that night?

A    Other than the people I knew?

Q    Yes.

A    I'm not really sure.  Most people, I believe, were wearing masks because of COVID.

Q    How did you know John Peterson?

A    I had met him --

He is a friend of Malcolm Green's.

Q    How did you know Malcolm Green?

A    From Georgia State.

Q    Had y'all attended classes together?

A    I met him at a party.

Q   Was it a party at some sort of club or organization?

A   It was just at someone's house.  And I don't know who it was.

Q   Do you remember when that was?

A   Within the year I started at Georgia State.

Q   So sometime between August and December of 2020?

A   Probably.

Q   Did you know Cassandra Ellerbee?

A   I don't believe so.

Q   Do you know a Matt Scott?

A   I don't believe so.

Q   Other than the lab work, do you have any other current employment?

A   No.

Q   Is that paid or for credit or --

A   It's unpaid, no credit.

Q   No credit?

So it's purely volun -- or -- purely voluntary, I guess?

A   Yes.

Q   Just for resume and future applications?

A   Yes.

34

Q    I called him Matt Scott.  In your responses to Interrogatories, you refer to a Matt from Atlanta Community Press Collective.

Who is that?

A    I think it might be a different Matt. There are a lot of people named Matt.

Q    In your responses to Interrogatories, which we've marked as Exhibit 12, you list the jobs at Smokerise Country Club and Fox Brothers Bar-B-Q.

Were you fired from either one of those jobs?

A    No.

Q    In your discovery responses, your -- you say your main doctor is currently Dr. Payal Suthar, who's a rheumatologist?

A    Correct.

Q    Page 13.

Would you characterize him as your primary care physician?

A    Yes.  She's the one I see most frequently.

Q    Have you --

How often do you see Dr. Suthar?

A    Every six months, but it depends on lab results because I get blood work done all the time.

Q    So you have seen her at least a couple of

times since the events of January 6, 2021?

A     Several times; but it's telemedicine, so not necessarily in person.

Q     Have you had any in-person appointments with her since January 6, 2021?

A     Yes.

Q     When was the first time after January 6 that you saw her in person?

A     I don't know off the top of my head.

Q     Was it within a month?

A     No.

Q     Did you have any tele appointments with her within a month after January 6, 2021?

A     I don't believe so.

Q     What kind of medications are you currently prescribed?

A     I take Xeljanz.

Q     How do you spell that?

A     X-E-L-J-A-N-Z (spelling).

Q     And what is that medication for?

A     It's a pretty strong immunosuppressant for people with psoriatic arthritis, rheumatoid arthritis, I think maybe also Crohn's disease.  It treats several autoimmune diseases, and it's usually reserved for severe or moderate symptomatic

36

patients.

Q    How do the --

Your particular diagnosis, how do the symptoms manifest themselves?

A    Most often it's joint pain because psoriatic arthritis is -- causes your body to attack itself; so it's most often my joints and soft tissues around my joints, but also my skin.

Q    Does it involve all your joints or are there certain ones that are more affected?

A    Certain ones are more affected than others.

Q    Which ones are those?

A    It would be usually my hips, my wrists and most of my fingers, my ankles, my upper and lower back and most of my toes.

Q    During the interaction with the police on January 6, 2021, did you ever say anything to police officers about your medical or physical condition?

A    No, but I believe I did let them know at least on one occasion that the zip ties were too tight and they were hurting me.

Q    Did they loosen them?

A    No.

Q    Since we're there, let me get a little

more detail about that.

So that was --

We'll come back to that and do it all in order.

Have you ever had any injury --

I know you're -- you get treated and you're on medication because of the diagnosed condition.

Have you ever been injured where you had to get medical treatment: broken bones, things like that?

A    I don't believe so.  But I played competitive soccer as a child, and there may have been something in there that I don't remember.

Q    What ages did you play competitive soccer?

A    Up until I was in high school, because I quit to go to GSMST and focus on my studies.

Q    They don't have sports teams?

A    No, they do not, not one.

Q    Did you play organized soccer in middle school?

A    Yes.

Q    Which middle school did you go to?

A    Shiloh Middle School, but I didn't play for Shiloh.

38

Q    Were you -- were you ever injured playing soccer to the point that you needed to get medical treatment, other than a visit with the trainer or something like that?

A    I think one time I fell and pulled a muscle in my back, but I don't remember if I went to the doctor for it.

Q    Have you ever been injured at work or any of the jobs that you've had?

A    No.

Q    Were you injured in the automobile collision that you had?

A    No.  It was minor.

Q    Have you ever been to a mental health professional or to a counselor?

A    No.

Q    Have you ever been to a physical therapist?

A    No.

Q    Have you ever been hospitalized?

A    I know once when I was a child, I had very severe strep throat; but I don't believe any other time than that.

Q    No surgeries?

A    No.

39

Q    Other than the --

How do you pronounce the medicine that you take for the arthritis?

A    Xeljanz.

Q    Xeljanz.  Other than Xeljanz, have you had any other prescription medications in the last two years?

A    Yes.  I took methotrexate tablets for a long time, and then I took injections of methotrexate every week.

Q    What's the purpose of that medicine?

A    It's also an immunosuppressant.  It's most commonly used for people with cancer who are going through radiation, I believe.

Q    Why were you prescribed that particular medication?

A    Because it's an immunosuppressant.

Q    Not because you had cancer?

A    No.

Q    In January of 2021, were you taking any prescription medications?

A    It almost certainly would have been the methotrexate.

Q    Okay.  Was that what they tried before the Xeljanz?

40

A    Yes.  I was on that for years.

Q    Did Dr. Suthar prescribe that, as well?

A    Yes.

Q    Has she been your rheumatologist for ten years or more?

A    No.  I was diagnosed with psoriatic arthritis when I was in high school.  And I went to CHOA for two years.  And then I saw Dr. Suthar, who's probably been with me the longest, if that's your question.

Q    When you --

When do you think you started to begin to see her?

I'll just tell you why I'm asking. Because we'll get medical records, and so I'm just trying to figure out which doctors I need to get medical records from.

A    Probably two years, I would guess.

Q    And it was CHOA before that?

A    Yes.

Q    Any other physicians that you've seen regularly in the last five years?

A    No.  Well, I was originally diagnosed with juvenile idiopathic arthritis, I believe, and then they changed it to psoriatic arthritis, because

41

that's just what you label it for children.  And I was diagnosed when I was younger than 18, I believe.

Q    Was that at CHOA or was that a pediatrician?

A    That was CHOA, but it was a pediatric rheumatologist.

Q    I can understand how an arthritis diagnosis may be impacted by being arrested and handcuffed.

Any other physical or medical conditions that you contend were exacerbated or caused by your arrest and handcuffing that night?

A    Other than my hands, I was told that my head hit John's when we were thrown on the ground, but I don't really remember it because it happened so fast; but I believe I've seen the video that shows us knocking our heads together.

Q    Did you have a knot the next morning?

A    I don't recall because I don't think I knew to check for it until a while later.

Q    And you had produced some photographs, which we're going to take a look at in a few minutes.

Did you take any --

Other than the photographs of your hands

SIENA WATCHULONIS - October 23, 2023

42

and arms and wrists, did you take any other photographs of alleged injuries from this event?

A    No.  I don't believe so.

Q    Okay.  I'm going to shift gears a little bit.

Do you need a break or are you good to keep going?

A    I'm good to go.

Q    Okay.  So was January 6, 2021, the first protest that you had ever attended?

A    Most likely not.

Q    Well, why do you answer like that?

A    Because that was a few years ago.  So I have probably been to one before, but it would have been about --

I know I went to the one that was about, like, Stop Asian Hate after those women were stabbed in Atlanta because that made me feel really bad.

And maybe another one with, like, a similar scene of, like, people being hurt for, like, no reason always makes me feel bad as someone who, like, wants to go into healthcare.

Q    Did you participate in any of the protests in the week after -- weeks after George Floyd's murder in May and June of 2020?

43

A    I don't believe so.

Q    Okay.  Do you remember even the month that the protest involving the Asian -- you said Stop Asian Hate, when that --

Do you remember what month that protest was?

A    No.

Q    And you think there may have been one other?

A    Possibly.

Q    Was there a police presence at the one regarding Asian -- Stop Asian Hate?

A    I don't believe a very large one because it was very peaceful, because I only go to peaceful protests, so --

Q    Was it in Atlanta?

A    Yes.

Q    The other one, do you recall any police presence at that one?

A    Not really, just, like, a couple cars that are, like, you know, typical of, like, a protest.

Q    Do you remember what month that one occurred, the other protest that wasn't Stop Asian Hate?

A    No.

SIENA WATCHULONIS - October 23, 2023

44

Q   Have you been to any -- attended any protests or similar events since January 6, 2021?

A   I don't believe so.

Q   Why not?

A   Because I am scared to go out again.

Q   And you travel back and forth to Georgia Tech; correct?

A   Yes.  I am a commuter student.

Q   Where do you park when you go to Georgia Tech?

A   At a parking deck that I pay for.

Q   Do you ever leave campus?

A   To go to Emory to do my internship.

Q   I mean when you're at Georgia Tech, do you ever leave campus --

A   Oh.

Q   -- in the downtown Atlanta area?

A   Not really.

Q   Were you --

How did you find out about the protest on January 6?

A   I don't recall.

Q   Were you part of any kind of chat group or did you have an app that alerted you to events like this?

SIENA WATCHULONIS - October 23, 2023

45

A    I don't believe so.

Q    Do you remember who you found out -- from whom you found out about it?

A    No.

Q    Did you go with anyone else?

A    I don't recall.

Q    How did you get there to the --

How did you find yourself at Centennial Olympic Park on January 6, 2021?

A    I guess I did carpool with someone because I don't re -- I didn't park there, my car wasn't there, but I don't remember who.

Q    Do you remember from where you left?

A    I think that we parked near the big stadium, Mercedes-Benz Stadium.  I think we parked in one of those parking areas because that's, like, a safe place to leave your car that you pay for.

Q    So had you been at school that day?

I don't know whether school would have been back in on January 6 or not.

A    I don't know, but it -- my school would have started within a couple days of that date.

Q    Before or after?

A    Maybe the day after or -- it's very close.  It's within a couple of days.  It's usually between,

PRECISION REPORTING, INC.
(770) 786-9664

46

like, the 7th and the 9th or something.

Q    What had you done earlier that day?

A    I don't remember.

Q    Had you been watching the events at the United States Capitol?

A    Possibly.

Q    Were you on social media?

A    I don't believe so.

Q    Where were you --

What motivated you to go to the event on January 6 at Centennial Olympic Park?

A    I just thought it was very sad that the verdict had come out that the police officer who had shot Jacob Blake in the back in front of his kids and paralyzed him didn't face any kind of repercussions at all.  And I just thought it wasn't really fair, and I felt bad for him and his family.

Q    Did you know Jacob Black --

A    No.

Q    -- or Blake?

Had you ever been to Kenosha before?

A    No.

Q    Had you had any online contact with Jacob Blake or any of his family?

A    No.

47

Q    Did you have any connection with him at all, other than just what you'd found out in the media?

A    No.

Q    How did you find out about the decision?

A    Probably the news would be my guess.

Q    Where did you get your news from at that point in time?

A    I think my parents like to keep, like, CNN on.

Q    So you would have been at home that day?

A    Probably.

Q    Were you --

Did you live in a dorm or did you live at home?

And that would have been your second semester at Georgia State.

A    I lived at home the whole time.

Q    And you don't remember anything at all about what you did that day or your activities prior to arriving at Centennial Olympic Park?

A    I was probably at home, and that's really all I can think of.

Q    Did you let your parents know you were going to Atlanta?

48

A    I believe I let my dad know.

Q    Did you drive down with your dad, since he was there?

A    I don't think so.

Q    Was your dad -- was --

Were your dad and mom still at the house when you left?

A    I don't know.

Q    Had you been to any training or discussion sessions or small group meetings about protesting and --

A    No.

Q    -- what to wear, how to act, those types of things?

A    No.

Q    What were you wearing that night?

A    I remember it being cold, so probably a jacket and hat.

Q    Were you dressed all in black?

A    I don't know, but I -- I don't think my pants were black.

Q    Do you -- do you know any Atlanta Police officers --

A    No.

Q    -- personally?

49

Do you know any law enforcement officers that work in any other jurisdiction?

A    No.

Q    Do you know anybody -- any individuals who work for the City of Atlanta, other than -- who are not police officers, that you know of?

A    I don't believe so.

Q    Do you know any other law enforcement officers, whether they work for Atlanta or some other jurisdiction?

A    I don't believe so.

Q    Had you had any alcoholic beverages that day?

A    No.  I can't have alco -- you can't have alcohol when you're on methotrexate.

Q    Had you taken that medication that day?

A    I don't recall, but I did have to take it once a week.

Q    Once a week?  Okay.

A    And it would have to be on the same day consistently.

Q    Does that medication have any side effects that affect memory or coherence or anything -- any mental function?

A    No.

SIENA WATCHULONIS - October 23, 2023

50

Q    Had you taken any nonprescription drugs that day: allergy medicines, anything like that?

A    I don't believe so.

Q    Had you used any illegal drugs that day: marijuana, anything else like that?

A    Definitely not.

MR. MITCHELL:  Let's take a quick break, and then we're going to watch some video.

THE WITNESS:  Okay.

(Whereupon, there was a recess in the deposition from 1:54 p.m. to 2:04 p.m.)

MR. MITCHELL:  All right.  Back on the record.

BY MR. MITCHELL:

Q    Before we look at video, I want to see what you recall about the events of that day.

When you first arrived at Centennial Olympic Park, what do you recall happening or going on?

A    I recall there not being that many people, which I wasn't really expecting a lot of people to be there, but -- I don't know -- there was, like, enough people to kind of fill the corner, maybe,

like, 20 or so.  And so I was like, well, it's not a terrible turnout, but I was like at least some people are here, you know.

And I recall a couple of people having signs, I think specifically ones that were -- had, like, messages of, like, mourning, is what I recall, for Jacob Blake and his family.

And I remember there being some candles, because people were holding candles, just like you do at a vigil.

Yeah.  That's kind of it.

Q   Did you know anybody -- when you got there --

And I know that folks were masked, but did you -- do you recall knowing anybody when you walked up to the group?

A   I don't recall recognizing anyone, like, immediately.  I don't -- I don't know.

Q   Did you ride with Mr. Peterson --

A   Maybe.

Q   -- or Mr. -- was Mr. Green --

Did Mr. Green ride with you?

A   Possibly.  I did know them, so maybe.

Q   What did you do when you arrived?

A   I think I walked up and grabbed a candle.

Yeah.  I think that's what I did.  And I was just kind of holding it.

Q    Did you give any interviews or did you say anything to anybody who was holding a video camera or video phone?

A    I believe so, yes.

Q    Who?

A    For my dad, who was walking around at some point just talking to people, like, why are you here, just stuff like that, you know, like most news reporters do, like, how do you feel, like, what are you doing here.

Q    Did you -- did you at any point before you arrived let anyone else know about the particular event and invite them to come or anything like that?

A    I don't believe so.

Q    How long were you -- was the group there on the corner prior to beginning to walk up the street?

A    I don't know.  Maybe -- probably less than an hour.

Q    Did you have your phone with you that night?

A    I think so.

Q    Okay.  Do you recall whether you took any

SIENA WATCHULONIS - October 23, 2023

53

pictures or took any video?

A    I'm pretty sure I did not.

Q    At any of the other events that you'd been to, did you take any pictures or any video?

A    No.

Q    Do you recall who made the decision or gave the suggestion to walk up the street?

A    Hum-um.  No.

MR. CEPAR:  Object to form.

What do you mean walk up the street?  I know we had the discussion with the motion to dismiss and stuff.

BY MR. MITCHELL:

Q    Let me clarify the question.

Do you -- who made the --

Do you know who made the decision or the suggestion to leave the corner and move to a different location?

A    No.

Q    Was it you?

A    No.

Q    Was it your dad?

A    No.

Q    Did you hear the suggestion or instruction given?

54

A     I don't recall.  I just kind of remember moving with the group because that's how most marches and protests and stuff work, as far as I know.

Q     How far away were you from the corner where you-all had gathered before you saw any police presence?

A     I --

Is your question if I was standing, like, close to the road?

Q     No.  My question is --

Well, let me back up.

While you-all were gathered on the corner there next to Centennial Olympic Park, did you see any police officers?

A     I'm pretty sure I did.

Q     Do you recall how many?

A     I'm pretty sure a few cars drove past.  I don't know.  Maybe, like, every 15 minutes one car would go past.

And I think in the parking lot across the street, someone may have pointed out a cop car that was kind of, like, parked and pointed at us and kind of watching, but I don't know how many cops were in it.

55

Q    Did you see any police officers out of cars on foot or on the street --

A    I think I --

Q    -- when you-all were gathered there at Centennial Olympic Park?

A    I think I may have also seen one in --
There's the parking lot and then the corner.  And there was, like, a parking deck.  And I think I saw a couple police officers, like, walking around the parking deck, which I -- I'm pretty sure I remember because I thought it was a little bit weird that they were, like, in the parking deck kind of walking around; but they didn't seem to be, like, looking for someone or, like, there was a broken car or something.

Q    Do you remember the route that you-all took when you left Centennial Olympic Park?

A    I believe so.

Q    What was that route?

A    From what I remember, we kind of ended up crossing the road and just getting onto the sidewalk on the other side because that's -- we just wanted to cross the road and kind of keep moving.  And then we just walked up the sidewalk for a while.

Q    What road were you-all walking along?

A    I don't know.

Q    You don't know the name of the road?

A    No.

Q    Once you-all began to move, when was the first time you saw more police arrive than what were located at the parking lot?

A    I -- from what I remember, it was relatively soon after -- there was, like, a road off to the side, I think maybe another way to get into the parking lot and the parking deck.  And there was, like, a crosswalk that was really short because it was just, like, one lane.

And I'm pretty sure shortly after that, I saw a bunch, like, behind us.  And it concerned me because there were -- it suddenly went from just, like, a couple around, like, I guess just kind of watching and making sure everything was fine to, like -- I don't know -- maybe ten.  And I just remember it kind of being a little alarming because I was kind of like, oh, where did they come from, that's kind of weird.

Q    When you-all crossed from Centennial Olympic Park to the other side of the street, were you in a crosswalk?

A    I don't believe so, but there -- from what

I remember, there weren't any cars on the road; so we just crossed the street and got back on the sidewalk.

Q    Were there --

Were those streets closed?

A    I don't remember, but I'm -- I don't remember.

Q    Had you seen cars other than police cars during the time you were there?

A    I believe a few but not very many.

Q    Did you happen to see the -- the --

You said there was a police car in the parking lot across from where you-all were gathered; correct?

A    I think so.

Q    Did you ever see police officers get out of that car?

A    I don't believe so because we passed them and had kept walking.

Q    Okay.  So how many blocks had you walked before you noticed the other ten officers?

A    Maybe one block.  I don't think it was very far.

Q    Did the -- did the police cars have lights on or -- their flashing lights, sirens, anything

58

like that?

A    I don't believe so at first.  I remember shortly after the crosswalk there, eventually a police car pulling up and kind of parking, but I don't recall him having his lights on.  Like, he just parked there, I think -- I guess to, like, watch where we were going.

Q    Was he in the -- was he in the road that was -- that was next to the sidewalk that you-all were on?

A    Yes.

Q    Was it a marked police car?

A    I'm pretty sure.

Q    Was it a car?  An SUV?  A truck?

A    I believe it was an SUV.

Q    Did you ever hear a dispersal order?

A    Yes.

Q    When did you hear the dispersal order?

A    Well, the first order that I heard was that people needed to not be in the road.  And I remember at that time thinking that I'm not in the road, so, like, that's fine.

        But I believe the dispersal order was given, that I heard, after there had -- we had seen cops come from, like, the side, from where I said,

59

like, they showed up and kind of come around us and then some come from, like, the -- like, around the corner at the end of the block, I guess, and then come down and had kind of already formed -- like, they were kind of already everywhere before I remember hearing a dispersal order the first time.

Q    How many times did you hear a dispersal order?

A    Well, as they closed in kind of around us and people, obviously, started backing up because we were kind of confused because we were just on the sidewalk, people started, like, you know, getting close to people around them.  And the closer the police got, I remember them saying it more often, even when they started grabbing people.

Q    So you heard a dispersal order before the police had actually gotten close to the group?

A    Not where I feel that it would have been fair for people to leave, as in, it would have been -- like, you would have had to either -- like, walk through a bunch of them, which was very intimidating if you kind of think about it; so it kind of felt a little bit more -- kind of like a threat because it felt like you would have to kind of, like, weave through them to leave.

60

Q    When you say walk through them or weave through them, who's the "them?"

A    The police officers.

Q    So let's tease that out a little bit.

What does disperse mean to you?

A    I think it means to leave, like, everything is over, like, you have to go back to your car and leave.

Q    Okay.  So from the time that you heard the first dispersal order, did you make any attempt to disperse, to leave the area?

A    The -- what I --

Well, the first thought that I had was, as I was seeing all, like, police officers kind of, like, come from nowhere, like, they just kept showing up, I didn't really feel comfortable leaving the group to go try and find, I guess, who I'd come with to leave because we had --

It was a dark street.  And I just remember feeling like it would have been scary for me to, like, walk down the street by myself and leave.

Q    Why?

A    Because it was a dark street, and there were -- there were already so many police officers, that I just remember this, like -- this kind of

61

feeling of doom where I was like this doesn't feel normal, like, it feels like something bad is going to happen.

Q    You were at the back of the group; right?

You were on the periphery of the group; right?

A    Yes.

Q    I mean, it would have been as easy for you to leave the group as anybody else in that group; right?

A    I suppose so.

Q    Okay.  So after you'd heard a couple of dispersal orders, you-all continued to move forward.

What do you recall next?

A    Well, we didn't really move much further forward because, like I said, there were police officers coming from, like, the back and fanned out toward the side.

And I believe at that time there were also a few more police cars present with police maybe getting out of them, so we didn't -- we didn't really get much further because, obviously, the people who had seen a bunch of police officers come around the side of the building had started slowing down; so everyone kind of just kind of started

62

bunching up together.

And as they came closer to us --

Well, by this time they had already grabbed someone who was on the sidewalk who -- they had already grabbed someone and I think one other person, maybe two other people, who had -- who I didn't really notice had done anything, that they were just grabbed on the sidewalk and, like, thrown down. And they were either detained or handcuffed. I'm not really sure.

But that also scared me because I remember seeing them walking, you know, kind of near me on the sidewalk and then being on the ground. And I didn't understand why; so that was also something I considered when you were saying, like, could you have just left.

Q    But the dispersal order had been given before those two people were arrested, had it not?

A    I'm not sure.

Q    Okay. Did you see any rocks thrown?

A    No.

Q    Do you remember anything the police officers said, any of the police officers? Do you remember any comments they made, from the time that you-all began to walk until you were arrested?

A    I don't remember any, but I think I remember them talking.

Q    Whose idea was it to link arms in the group?

A    I don't know.

Q    Was there an order --

Was there an instruction given or a suggestion made?

A    Maybe.

Q    Did you make it?

A    No.

Q    Whose arms were you linked with?

A    I believe my arm was linked with John's.

Q    Anyone else?

A    I am pretty sure I don't know the other person.

Q    Okay.  Was that your idea or his idea or how did that happen?

A    Well, because the officers had continued advancing toward us and they had, from what I recall, already grabbed a few people and we didn't really understand why or what was happening, we were all very much bunched together at that point against the wall.  And because they had started grabbing people, seemingly, kind of for no reason to us, it

64

kind of felt normal.

Q   You'd agree with me that you can't disperse when you've grabbed onto one another; right?

A   I suppose.

Q   I mean, dispersal is when a group separates and goes, as you said, back to their cars; right?

A   Um-hum.  Yes.

Q   And you didn't make any effort to do that, did you?

A   No, because I was scared to leave.

Q   All right.  Well, I understand your mo -- what you say your motivations were.

But you did not make any attempt to obey the dispersal order, did you?

A   I actually probably would have.

Q   Understand you would -- and you say that now.

Did you at the time ever make any effort to obey the dispersal order?

A   I probably said something to the people around me that maybe we should leave.

Q   Okay.  So who did you say that to?

A   I don't recall.

Q    Did you -- did you personally make any effort to leave?

A    I'm pretty sure I said something like maybe we should try and leave.  But as I saw more people -- as I con -- like, weighed my options, I thought it might have been safer to just stay on the sidewalk because, in dispersing, it would have almost certainly been expected that I had to walk through the street.  And I didn't want to leave the sidewalk because I thought that was where I would be safe.

Q    Well, you and Mr. Peterson were at the back of the group; right?

A    I don't think we were at the very back but, like, toward the back.

Q    All right.  So you could have -- you could have told Mr. Peterson and Ms. Ellerbee, let me go, I'm leaving, and just let go and walked away; correct?

A    I could have.

Q    Okay.  But you didn't -- you didn't make any --

You didn't say to either one of them, let me go, I want to leave?

A    No.

66

Q    At any point from the time you left the corner next to Centennial Olympic Park, were you ever in a street off the sidewalk?

A    Briefly I recall crossing the street as a group when there were no cars, but I, of course, made it a point to get off the road and back onto the sidewalk.

Q    And you-all had to cross two other streets before you got to the point where you were arrested; correct?

A    I recall one, but it could have been two.

Q    Did you come to those streets before or after the first dispersal order was given?

A    I remember crossing the first crosswalk, and I did stay on the crosswalk.  I don't recall the second street, so I don't know.

Q    Before you crossed the street -- that street with the crosswalk, had the dispersal order been given?

A    I don't believe so.

Q    Did you-all have a walk sign or green light?

A    I don't recall, but I remember the street being very small and there, very obviously, being, like, no traffic.

67

Q    Do you recall any of the officers saying anything specifically to you that you felt like was directed at you prior to the time you were arrested?

A    I don't remember me specifically, but I believe I remember -- I remember -- I believe as the officers got very close to us and started -- continued saying disperse, it really felt more like a taunt as we were backed up against the wall.

And I think I remember maybe John or someone else, like, behind him yelling at one of the officers to, like, let us go, you can't be doing this, we're on the sidewalk, and then someone saying -- like, them, you know, obviously, yelling back at us and someone saying, you guys don't have the temperament to be able to hold a gun.  And then that just made them really angry.

Q    You used pronouns in that last statement. Tell me again --

Explain to me that last statement about you don't have the temperament to hold a gun.

Who said that to whom?

A    It was someone on my right side said, like, you, as in, the officers, but also there was one officer who I remember looking just really, really angry.  Like, I feel like I remember, like,

he seemed to be really angry, and I was really scared. And he just looked -- and so someone said, like, you guys don't have, like, the temperament to hold a gun. And then he just looked even crazier.

Q   Was that --

A   And then they started, like, grabbing people and throwing them on the ground even more.

Q   Was it a male or a female voice?

A   I'm not sure. I think it may have been a male.

Q   Was it to your right or your left or in front of you?

A   I think it was my right.

Q   Okay. I don't think we have any tissue.

Do you want a napkin?

A   No. It's fine. I'm fine.

Q   Did you see the names of any of the officers that you remember?

A   No, I don't.

Q   Okay.

A   I just remember seeing their faces and how angry they looked.

Q   And I've put up on the screen --

Let me orient you to what we're --

Have you ever seen body-worn camera

69

footage before today?

A    Maybe.

Q    Okay.  In the YouTube video that I think you told me you'd seen, there's clips of body-worn camera footage in that video; correct?

A    I think so.

Q    Okay.  So this particular video is from Officer Jack Wright's body-worn camera.  The --

In the lower left-hand corner, you'll see on this one it says 54-2.

Do you see what I'm talking about?

A    Yes.

Q    So each of the videos that we'll be looking at during the course of this case have a unique name or number at the bottom there, so that's how we'll identify the videos.

The -- up at the top right-hand corner, you see a second line that says Axon Body 3.  And then above that it's got the year, month and day. And then we've got a timestamp in what I call military time.

And where we've stopped it, it says 21:03:11.

Do you see that?

A    Yes.

70

Q    Okay.  So as we move through the video, I'll be starting and stopping it.  And I will identify the points where we stop it by that timestamp in the top right-hand corner.

Okay?  Fair enough?

A    Okay.

Q    And I'll also say I'm going to -- I'm going to fast-forward through some of this.  If there's anything that you want to go back and look at, feel free to let me know that, and we'll go back and take a look.

A    Okay.

(Video played.)

BY MR. MITCHELL:

Q    I've stopped it at 21:05:36.

Is that --

What we're looking at, there's a police vehicle, and we're looking towards an intersection.

Is that one of the intersections you-all walked across from the park to where you were arrested?  Do you recall?

A    Maybe.  I think I remember that parking deck.

Q    Okay.  I've stopped it at 06:50.

Do you recall this being along the route

71

that you were -- you-all were traversing?

A    Yes.

Q    Okay.  Okay.  And I've stopped it at 06:56.

And we see a group of officers in the -- on the far right and then another group of officers in the middle of the screen.

You were telling me a few minutes ago about two people that had been arrested before you.

Is this -- is this what you were talking about, what we see on the video?

A    I believe so.

Q    Do you recognize the voice of the person who's saying, "What's up, P?

A    I don't think so.

Q    We've stopped it at 07:21.

And we hear a male voice talking about getting anger management and don't have the temperament to hold a fucking gun.

Is that the comment you were telling me about earlier?

A    Yes.

Q    Okay.  Do you know who that is?

A    No.

Q    Did you know who it was that night?  Did

72

you know who --

Did you know that person that said that?

A    I don't --

Q    Let me ask a better question.

You were telling me a few minutes ago about this comment that was made.

A    Yes.

Q    As you were telling me about that, do you recall that you knew the person who had said that at the time that that comment was made?

A    No, because I couldn't, like, tell who it came from.

Q    I've stopped it at 7:32.

And you heard traffic -- or radio -- something that was said over the police radio.

Do you remember hearing anything over the police radios that night as you were walking up the road?

A    Not that I can recall.

Q    I've stopped it at 8:18.

Are you --

Do you know whether or not you're in the video that we're seeing?

Can you -- from the -- from the backpacks or who's around, can you tell whether you're in this

73

video?

A    I think I've seen my glasses once or twice.

Q    And if that -- if that's the case, which one of the --

Are you the person with the TNT/TBS backpack or the one to the right?

A    I remember having a backpack that was ripped off me I think after I was handcuffed, so that might be me.

Q    Okay.  I've stopped it at 8:40.

Is the person in the bottom right, is that you, with the glasses?

A    I think so, yeah.

Q    I've stopped it at 8:50.

Do you remember hearing the officers tell you to let go?

A    Yes.

Q    Okay.  Do you know what they meant?

A    I think they meant for me to let go of the person next to me.

Q    You were linked arms with John Peterson; correct?

A    I think so.

Q    Okay.  And they were --

74

And you understood the command to let go to be to release your arm lock with John Peterson; correct?

A    Yes, but I was scared because I heard other people screaming, like, in pain.  And it scared me, and so I held on because I was scared.

Q    So you held onto John Peterson after you understood the instruction to let go?

A    Well, it was yelled at me while I was being dragged on the ground.  And there was a lot happening, so I -- I can't tell you if I fully registered it because so much other stuff was happening to me.

Q    But you heard the -- you did --

You do recall, even as we sit here today, hearing the command to let go?

A    Probably.  But I just heard it now, so I -- it's kind of confusing me.

Q    But I think you told me that you consciously made the decision not to let go because you were scared; correct?

A    Yes.

Q    Okay.  So you knew that they had wanted you to let go.  You just didn't because you were scared?

75

A     Probably.

Q     You didn't let go; correct?

A     Not at that moment.

Q     Okay.  And you didn't let go, you said, because you were scared; correct?

A     That's what I recall.

Q     Okay.  Even though you knew that the officers wanted you to let go?

A     I guess so.

(Defendant's Exhibits 2 through 11 marked.)

BY MR. MITCHELL:

Q     Before we go any further, let me show you what we've marked as Defendant's Exhibits 2, Defendant's Exhibit 3, Defendant's Exhibit 4, Defendant's Exhibit 5, Defendant's Exhibit 6, Defendant's Exhibit 7, Defendant's Exhibit 8, Defendant's Exhibit 9, Defendant's Exhibit 10 and Defendant's Exhibit 11.

Can you take a look at those for me.

Can you -- can you identify -- just generally identify the documents for me?

A     Yes.  This is the pictures that I took very soon after I got home, after being let go from -- with the signature -- the signature bond --

Q    Who took the --

A    -- from the jail.

Q    I'm sorry.  Who took the photographs?

A    I think my sister did.

Q    And what did she --

On what device did she take those pictures?

A    I think it was my phone.

Q    When did you -- when did you find those pictures?  I got them a couple weeks ago.

When did you -- when did you provide them to your attorney?

A    I believe as soon as possible after we decided to move forward with a case.  I sent them to him immediately so that he could have a record of it, just in case anything happened.

Q    Are those the only pictures from January 6 on your phone?

A    I believe so, because I took them when I got home, which would have been the next day.

Q    Okay.  And have you gone back and checked your phone to see if there's any other pictures from January 6?

A    Yes.

Q    And there's nothing more?

A    No, because I saved these intentionally. And the others -- well, not the others.  Any other photos from more than a month ago I don't take the time to save.

Q    And did you tell me earlier that you did not take any other pictures or video that day or that you don't recall whether you took any pictures or video that day?

A    I'm pretty sure that I did not.

(Thereupon, marked for identification purposes, Defendant's Exhibit 2.)

BY MR. MITCHELL:

Q    Okay.  So the first --

Exhibit No. 2, what does that show in terms of injury?

A    It shows bruising and a few lacerations to my hand and knuckles.

Q    How did the bruising occur?

A    In my opinion?

Q    Yes.

A    Probably from the zip ties being too tight or being thrown on the ground, probably some combination of both, but --

Q    I'm not talking about the last --

SIENA WATCHULONIS - October 23, 2023

78

I'm talking about the bruise in the middle of the hand.

Do you think that happened from the zip ties?

A    Yes.

Q    Okay.  When they were --

After you failed to let go of John Peterson, do you recall the police officers grabbing your hands?

A    Yes.  After -- yeah.  I recall being taunted a bunch and then them, like, pulling us apart --

Q    Okay.

A    -- and then, like, throwing me on the ground and grabbing me.

Q    We'll get to what they said.

What I'm asking now is:  Do you recall them -- do you recall them grabbing your hands when you did not let go?

A    Do you mean when they put the zip ties on me or in general?

Q    I'm talking about at the point in time --

I mean, we can back it up.  We're at 8:57, and we just heard a police officer say let go.  And then in a few seconds, we're going to see another

officer use strikes to Mr. Peterson to try to get him to comply.

I'm talking about in this time frame.

Before you let go, do you recall the police officers grabbing your hands?

A    Not that I recall.  I remember it more being my, like, biceps and elbows to pull me apart.

Q    I've stopped it at 9:01.

The police officer's hands, as we can see on the frame, is holding a yellow can with a black top that it appears to have taken out of Mr. Peterson's backpack.

Do you know what that is?

A    No.

Q    You had something similar in your backpack, didn't you?

A    I don't believe so.

Q    Is that pepper spray?

A    I don't know.

Q    Okay.  At this point we can hear you saying stop, stop.

Who are you talking to?

A    Them, the police officers hurting John.

Q    Did you ever tell Mr. Peterson to let you go?

SIENA WATCHULONIS - October 23, 2023

80

A     I don't recall.

Q     Did you ever voluntarily let go of Mr. Peterson or did you and he have to be pried apart by the officers?

A     I believe at some point I let go.

Q     But only after the officers had grabbed your hand and Mr. Peterson had been hit; correct?

A     I believe that I let go after they punched him because I thought they were going to punch me.

Q     Have you read anything about police tactics for arrests and with noncompliant suspects?

A     No.  So I did let go.

Q     At that point in time, was Mr. Peterson continuing to hang on to you, even though you wanted to let go?

A     I don't recall.

Q     You saw the officer holding a hand and bending the wrist back in that vid -- in that part of the video.

        Did you remember seeing that?  I can back it up if you need me to.

A     Can you back it up?

Q     Sure.  I've stopped it at 9:42.

        You see in the top right-hand -- top left-hand corner the black glove holding that

81

particular -- a hand and bending the wrist slightly back?

A    I -- it kind of looks like that.

Q    At that -- at this --

When they were trying to get the two of you separated, do you ever recall them bending your wrist back?

A    No.

Q    When Mr. Peterson fell, did he hit your head?

A    I think so.

Q    Well, you can't see it from that --

A    Yes.

Q    And what part of your head did he hit?  Do you know?

A    It looks like my right side.

Q    Did you have a headache the next day?

A    I don't recall.

Q    I've stopped it at 10:32.

We just saw them put handcuffs on, not zip ties.

Do you have any complaint about the way the handcuffs were --

I know you contend that your arrest was not appropriate.

82

Do you have any contention about the way they handcuffed you?

A    Are you talking about how they pulled my arms back or that I'm pretty sure I mentioned at least once that they were on too tightly?

Q    So I'm -- generally.  With regard --

Did you say something about your arms?

A    I am pretty sure I heard myself say, ow, you're hurting me, and something else like that.

Q    And then with regard to the metal handcuffs, did you ever complain about them being too tight?

A    Maybe.

Q    Do you recall?

A    Not at the moment.  I might with -- if I re-watch the video.

Q    We've stopped it at 10:43.

The person that's standing on the -- kind of the -- to the right of the frame in bluejeans and a black shirt and a mask, do you know who that is?

A    I don't think so.

Q    Do you know who the woman is a little further back that's got kind of the checkered shirt hanging around her waist?

A    I don't think so.

83

Q    I'm going to switch to Jasmyn Hawkins'
video.

You'll see this one, in the bottom
left-hand corner, it says 54 -- 54, underscore, 200,
underscore, Ted, underscore, Turner, underscore
protest?

A    Yes.

Q    Okay.  And then we've got the same
information in the top right.

I've stopped this video at 21:09:52.

In the middle of the frame is a -- looks
to be a cameraman of some sort.

Do you know who that is?

A    The person holding the light?

Q    Yes.

A    I don't think so.

Q    We've stopped it at 11:52.

That's you, right, on the ground?

A    Yes.

Q    If you skip forward with it paused, it
quits on you.

Okay.  I've stopped it at 11:48.

That's you, right, on the ground?

A    Yes.

Q    I've stopped it at 12:26.

Why were you carrying a knife?

A    I usually carry a small pocket utility knife of some sort if I'm not at school just because I find it to be very practical.

Q    Did that -- did that particular device have anything other than a blade?

A    I don't recall.

Q    I've stopped it at 13:07.

Just before that we heard you complain about your wrists.

Is that the -- what you were --

Is that the point that you were telling me about earlier?

A    I believe it's another point, as well.

Q    Okay.  But there you tell the officer that your wrists were injured when they were trying to separate you and Mr. Peterson; correct?

A    That's what it sounds like.

Q    Why were you wearing a ballistic vest?

A    I was scared of being shot.

Q    Whose vest was that?

A    My dad's.

Q    If it was a peaceful protest, why were you concerned about being shot?

SIENA WATCHULONIS - October 23, 2023

85

A    Because during, I believe, the same year, there were other peaceful protests where right-wing groups showed up and instigated violence in peaceful -- against peaceful protesters.

Q    In Atlanta?

A    In other cities.

Q    But you hadn't seen or heard that in Atlanta?

A    I don't recall if I did.

Q    I've stopped it at 13:42.

Do you have any complaints about the way that you were patted down?

Again, understanding that you contend your arrest was inappropriate, any -- do you have any complaints about the way you were patted down?

A    No.

Q    Did this particular officer, the female officer, Jasmyn Hawkins, did she ever say anything to you that you thought was inappropriate or wrong?

A    Not that I can recall at the moment.

Q    I've stopped it at 14:46.

That bag that's got TNT/TBS, that was you; right?

A    Yes.

Q    That's your bag?

86

Do you know who this person is right here that I've got the arrow on -- we've stopped it at 14:57 -- the fellow facing the camera with the either blonde or gray hair?

A     I can't really tell.

Q     Were either of those two individuals part of the vigil?

A     I don't know.

Q     This individual right here, do you know who that is, the -- kind of to the right and those two individuals at 15:03?

A     I don't recognize them.

Q     At 15:27, do you know who that individual is in the middle of the frame?

A     No.

Q     Was he part of the vigil and march?

A     I don't know.

Q     I've stopped it at 15:37.

A woman just walked by with long blonde hair.

Did you know who she was?

A     Can you play it again?

Q     Sure.

A     No.

87

Q     We just --

All right.  I'll ask -- I don't know --

I can't recall whether you said you couldn't tell or didn't know who this person was -- I've stopped it at 15:56 -- the gentleman holding the light and the cameras?

A     I don't think I know them.

Q     I've stopped it at 16:27.

That individual that's in the middle of the frame, do you know who that is?

A     No.

Q     This is Officer Norman Faulkcon's body-worn camera.  It's got -- in the lower left-hand corner, it's got the number 39.  Again, in the top right-hand corner, it's got the same information that we discussed earlier.

Did you see the officer remove the yellow can from your sweatshirt?

A     No.

Q     Do I need to back it up?

Actually, it's not yellow.

What is that that the officer is pulling out of your pocket?

At 9:04, that right there, what is that?

A     I can't tell from this picture.

88

Q     You don't know what --

You don't remember what you had in your sweatshirt that night?

A     No.

Q     Now, you had talked about earlier that the off -- you felt like the officers were taunting you.

Did you ever feel the officers were taunting you after you were arrested?

A     It felt like they were happy to be doing what they were doing, as though the taunting led up to it.

Q     When you say they were taunting you, what were they saying or what were -- what were they doing that suggested to you that you were being taunted?

A     In a different body cam that you showed, you can see them -- hear them saying you need to disperse, you need to disperse.  And you can hear people saying back that you should let us disperse and let us go.

And you can't see it from this body cam.  But as the officers are, obviously, already very close to us, they've already done that from, what I remember, all the other sides.  So if you can hear

people saying, then, let us go, at that point there really wasn't -- there wasn't a way to disperse, even as they were saying it.

Q   But after the individuals that were on the sidewalk said let us go, you never let go of Mr. Peterson or Mr. Ellerbee [sic].

You continued to keep your arms locked; correct?

A   No.  At several points you hear me say, I have let go, I did let go.  And they still continue to be very rough with me personally.

Q   I'm not -- I'm talking about before you -- before you were taken to the ground.

Did you ever let go of Mr. Peterson and Mr. Ellerbee -- or Ms. Ellerbee prior to that time?

A   I don't recall.

Q   Was it the female officer that put the zip ties on you in the lighted area of the booking room?

A   I guess it must have been.  I don't remember the change from the metal cuffs to the zip ties, mainly because I couldn't see what they were putting on me.

Q   And you think that you complained verbally about they were too tight?

A   I think I did.

Q    Okay.  Was that while you were in that room or was that in the vehicle on the way to the Detention Center?

A    I don't recall.

Q    Okay.  In the video we watched earlier from Jasmyn Hawkins, you heard her offer you medical attention; correct?

A    Yes.

Q    Okay.  And you refused medical attention; correct?

A    Yes.

Q    Did you ever ask to go to the hospital?

A    I don't think so.

Q    Did you ever go to a doctor for your -- to see about the injuries to your hands and wrists that are reflected in Exhibits 2 through 11?

A    No.

Q    Did you ever say anything to Dr. Suthar about those injuries?

A    No.  I was scared of having to tell her what it came from because she would ask and she would want to know.

Q    Did you ever tell any doctor about those injuries?

A    I don't believe so.

SIENA WATCHULONIS - October 23, 2023

91

Q Did you ever have to get any physical therapy as a result of the events of January 6, 2021?

A No.

Q Did you ever go to a counselor or mental health professional as a result of the events of January 6, 2021?

A No.

Q So looking at Exhibit No. 2, the main focus of this particular exhibit are the abrasions and the bruise in the middle of the hand?

A It looks like that.

Q And you think that these injuries came from the handcuffs?

A Yes.

Q Is there any other possible reason for these particular injuries, based on the video we just saw?

A I don't think so.

(Thereupon, marked for identification purposes, Defendant's Exhibit 3.)

BY MR. MITCHELL:

Q What does Exhibit No. 3 show?

A There -- look like there are bruises on

92

the inner side a little bit above the wrist.

Q    Which hand is this?

A    My right hand.

(Thereupon, marked for identification purposes, Defendant's Exhibit 4.)

BY MR. MITCHELL:

Q    Exhibit 4 is --

That's the similar picture to the Exhibit 2, isn't it?

A    Yes.

Q    Same hand; right?

A    Yes.

(Thereupon, marked for identification purposes, Defendant's Exhibit 5.)

BY MR. MITCHELL:

Q    Exhibit No. 5, that's your left hand?

A    Yes.

Q    How did that injury occur?

What does it show?

A    A bruise on the top middle of the left hand.  And --

Q    There also appears to be a little abrasion or a sore?

A    Yes.

Q    Did that happen during the arrest?

A    I believe so.

Q    What do you think caused this particular bruising?

A    I would also say probably the handcuffs and the abrasion from being on the ground and dragged.

Q    Is it possible that when the officers were trying to pull your hands off Mr. Peterson, that, perhaps, they caused that bruising?

A    It didn't look like they grabbed that part of my hand to me.

                    (Thereupon, marked for
                    identification purposes,
                    Defendant's Exhibit 6.)

BY MR. MITCHELL:

Q    Exhibit No. 6, that's just another picture of the right hand?

A    Correct.

Q    Were these pictures all taken at the same time?

A    Yes.

Q    Were there --

        Are there any other pictures of your

injuries?

A    I don't believe so.

Q    Did you take any, like, two weeks later, a month later?

A    No.

(Thereupon, marked for identification purposes, Defendant's Exhibit 7.)

BY MR. MITCHELL:

Q    Exhibit No. 7, which hand is that?  I can't tell.

A    My left hand.

Q    And is that supposed to show the two areas of bruising there?

A    Yes, one on the outside forearm and one on the side of the hand close to the pinky.

(Thereupon, marked for identification purposes, Defendant's Exhibit 8.)

BY MR. MITCHELL:

Q    Exhibit No. 8?

A    Is a similar photo, but you can see the bruising on the top of the hand, as well.

(Thereupon, marked for identification purposes,

95

Defendant's Exhibit 9.)

BY MR. MITCHELL:

Q    What about Exhibit 9?

A    That appears to show a bruise on the top of the left hand but also one further up the arm.

(Thereupon, marked for identification purposes, Defendant's Exhibit 10.)

BY MR. MITCHELL:

Q    Exhibit 10?

A    Another photo of the left hand.

(Thereupon, marked for identification purposes, Defendant's Exhibit 11.)

BY MR. MITCHELL:

Q    And Exhibit 11?

A    Some bruising on the right hand on the inner forearm.

Q    Any other injuries from the -- your arrest on January 6, 2021, other than what's shown in these photographs?

A    Other than, like, psychological damage?

Q    We'll get there.

A    No more physical injuries.

Q    No more bruises?

SIENA WATCHULONIS - October 23, 2023

96

A    Not that I recall.

Q    No other scratches or abrasions?

A    I don't think so.

MR. MITCHELL:  Let's take a short break.

(Whereupon, there was a recess in the deposition from 3:15 p.m. to 3:27 p.m.)

BY MR. MITCHELL:

Q    This is going to seem like an awfully random question; but it's in some of my preliminary questions, and I just skipped it.

Do you have any tattoos?

(Off-the-record discussion between the deponent and Mr. Cepar.)

A    I didn't at the time.

BY MR. MITCHELL:

Q    Okay.  Do you now?

A    Yes.

Q    What do you have?

A    Do I have to answer that?

MR. CEPAR:  Well, let me confer with my client.

THE WITNESS:  Yeah.

97

MR. MITCHELL:  Okay.

(Thereupon, a discussion was held off the record.)

MR. MITCHELL:  Okay.  We can go back on the record.

BY MR. MITCHELL:

Q    Do you --

I think you told me earlier you have not gotten any medical treatment as a result of any physical injuries that may have occurred on January 6, 2021; correct?

A    Yes.

Q    That's true that you -- no medical treatment?

A    Not for the injuries I received, no.

Q    And have you sought any kind of counseling or mental health treatment for anything -- as a result of anything that occurred on January 6, 2021?

A    No.

Q    Aside from --

I know that you have a condition.

Have you been injured since January 6, 2021?

A    No.

Q    Do you recall that when the officer

searched your backpack, that you had something in a small plastic container and the officer had trouble opening the container?

I can show you on the video if we need to.

A    I think I recall.

Q    You said that they weren't yours, someone had given them to you?

A    Yeah.  I believe I let some people keep things -- put some stuff in my backpack that they didn't want to hold.

Q    And that was some sort of cannabis or marijuana edible; correct?

A    I believe I said I didn't know because I didn't know.

Q    But they weren't yours?

A    That's correct.

Q    Who gave them to you?

A    I don't recall.

Q    Was it someone that you had ridden down with?

A    I don't believe so.

Q    Is there anything that you have been unable to do since January 6, 2021, that you were able to do before that?

A    Well, my autoimmune condition has

worsened.  And it limits my, like, movements and dexterity.  And sometimes it makes it, like, hard for me to walk.  And I'm getting nauseous, and I have fatigue and stuff like that.

Q    So the -- what you characterize as the worsening of your autoimmune condition, do you contend that has anything to do with the events of January 6, 2021?

A    I think it could because my arthritis has gotten worse in my hands specifically and my wrists.

Q    Is the type of arthritis you have something that is progressive?

A    Yes, but the medications that I'm on are supposed to keep it -- my body from making it worse, not exterior forces.  It wouldn't help with that.

Q    Is there any research that suggests that trauma to the wrist progresses the type of arthritis that you have?

A    I don't know that personally, but I would think it would be worth looking at.

Q    But you haven't talked to a doctor about that particular aspect of this, have you?

A    I don't believe that in its specific capacity, but I have been told to be very careful with what I do because the immunosuppressants allow

SIENA WATCHULONIS - October 23, 2023

100

my body to heal more slowly.  So any damage I receive will take longer to heal, and it will hurt me more because of the disease.

Q    Since January 6, 2021, have you seen any doctors other than Dr. Suthar?

A    Probably.

Q    Who or what kind of doc --

A    My OB/GYN.  I think I had to get a vaccine for something.

Q    Does your -- does your OB/GYN provide any kind of treatment or counseling to you with regard to your arthritis?

A    No.

Q    Did you tell your OB/GYN anything about the events of January 6, 2021?

A    No.

Q    You weren't injured in any way that would be something that an OB/GYN would treat you for as a result of January 6, 2021?

A    No.

Q    And you -- I think you told me earlier you have not told Dr. Suthar about the events of January 6, 2021?

A    That's correct.

Q    Has she told you that your condition --

101

your arthritis condition has worsened since January of 2021?

A    Based on my symptoms, yeah.  She's had to transfer me to a different medication, which would have been the Xeljanz, which is for more of a severe form because it's not as well-known as methotrexate. It hasn't been around as long, and I believe it has worse black-box warnings.

Q    When did that transition occur?

A    A couple months ago.

Q    So sometime in the late summer of 2023?

A    Yes.

Q    When did Dr. Suthar first begin talking with you about transitioning you to another medicine?

A    More than a year ago because I wasn't happy, I believe, with the old medication.  I thought that it was starting to work less effectively, but it's been a while.

Q    So sometime in late summer or early fall of 2022, you first complained to Dr. Suthar about your medicine not being as effective?

A    I think so.

Q    Okay.  So up until that point in time, the methotrexone [sic] had worked fine?

A    Yes.  I -- but it also -- the flare-ups or cases when my illness would get worse or spike is -- doesn't happen, like, on a consistent rate necessarily.  It usually will happen if I'm, like, sick or I do receive some kind of, like, severe fatigue, like, I overexercise or something or it's very cold.  And that will sometimes give me a flare-up, so it's not --

It could be that I'm getting worse.  But until I get a really bad flare-up that is worse than normal, I wouldn't really know that it's getting worse.

Q    So when did you first have a flare-up that you thought was worse than normal after January 6, 2021?

A    I don't recall specifically, but I probably would have mentioned it to my doctor the next time that I saw her.

Q    Okay.  Would you have made an appointment specifically to address the flare-up?

A    Not usually, unless it's very bad.

Q    Are your telehealth appointments with Dr. Suthar, are they on a regular schedule?

A    Yes.

Q    I know you --

103

How often do you get the blood work?

A   On the methotrexate, I used to get it every two to four months.  And with this new one, I have to get blood work done every four weeks, six weeks, eight weeks; so it's still relatively consistent.

Q   And how often --

What are your regularly scheduled appointments with Dr. Suthar?  How often do those occur?

A   Usually about every six months.

Q   Okay.

A   Sometimes sooner if I have an issue.

Q   Okay.  Do you remember when the first appointment with Dr. Suthar would have been after January 6, 2021?

A   No.

Q   Have you asked her for your medical records?

A   No.

Q   So that testimony was elicited by my question what activities are you unable to do now that you could do before January 6, 2021.  And you just said that your condition had -- to you appeared to have worsened.

SIENA WATCHULONIS - October 23, 2023

104

Are there any activities that you can't do now that you could do before January 6, 2021?

A    I like backpacking and camping and, like, hiking.  And it's harder for me to do that now as I -- my joints get much more painful, especially when I'm carrying weight.  And usually we have to end the trips early because I can't finish them.

Q    So how often since January 6, 2021, have you taken a backpacking trip?

A    Usually a few times a year.

Q    And the "we" that you were talking about, who is that?

A    Usually my family.

Q    And where do you typically go?

A    The Appalachian Trail.

Q    So prior to January 6, 2021, how long would you-all hike?

A    Well, we also go to Stone Mountain and sometimes Amicalola, which is near the Appalachian Trail.

In the summer, like, once or twice a week.  And then in the fall, once a week.  And probably less in the wintertime.

Q    That's because the cold affects your condition?

SIENA WATCHULONIS - October 23, 2023

105

A    Yes.

Q    And so prior to January 6, 2021, how long either in time or distance would these hikes be?

A    Probably upwards of three to five miles.

Q    And since January 6, 2021?

A    Like, three miles or less per, like, day.

Q    After January 6, 2021, when was the first time you-all went hiking after that date?

A    I don't recall.

Q    Would there be any way to figure that out?

Would there be credit-card receipts, a journal, a calendar or anything?

A    Probably not because we would just, like, talk and decide to drive and go.

Q    Anything else that you can't do now or that's been impacted by --

A    Well, it often makes it difficult to write or type for long periods of time.  And I've noticed that at school when I'm, like, taking notes.  I switched to, like, a Surface Pro to write with instead of handwriting because that hurts more.

Q    Which one hurts more?

A    Handwriting.  The, like, e-Pen is easier to use.

Q    And when did you first notice that change?

SIENA WATCHULONIS - October 23, 2023

106

A    I don't recall specifically, but it was within my first year of college.

Q    So while you were still at Georgia State?

A    I believe so.

Q    When did you first notice that?

A    I --

Q    What prompted you -- or what clued you in that writing was becoming more difficult?

A    There is a soreness that I get in my hands, especially with repetitive movement; so something like writing -- it would be like if I take a handwritten test, I could go for, like, 45 minutes in before it starts kind of hurting.  And that would probably decrease to, like, 15 or 20 minutes, which is not good for, like, long tests.  You just kind of have to, like, tough it out.

Q    Have you requested any kind of accommodation as a result of that?

A    I haven't yet, but it's -- because it's a lot of paperwork and a lot of effort.

Q    Anything else?

A    Oh.  I can't -- I can't do pushups anymore.  I used to do, like, HIIT workouts and, you know, pushups and situps; but my wrists don't flex far enough for me to do a pushup or it causes really

SIENA WATCHULONIS - October 23, 2023

107

severe pain.

Q    When did you first notice that change?

A    A few years ago.  It's been a while, but I don't recall specifically.  It's just --

Probably since my freshman, maybe early sophomore year I noticed it.

Q    How often would you do pushups before that?

A    I usually work out two or three times a week.

Q    So how have you --

Do you have some other exercise you can do now in lieu of doing the pushups?

A    Yes, but it's not, like, as effective as a pushup.  It's, like, a pushup on your elbows, more like a plank; but the, like, flexion and extension for, like, the bicep and tricep isn't -- it's just not the same.

Q    Any other activities that you think you can't do now that are related to the events of January 6?

A    Not that I can think of at the moment.

Q    What are you seeking to recover in this lawsuit?

A    I would like damages for being unjustly

108

arrested, in my opinion, and also hurt physically, and also damages for being, effectively, intimidated out of peacefully protesting.

Q    Do you have a particular figure in mind?

THE WITNESS:  Can I talk -- do you mind?

BY MR. MITCHELL:

Q    Well, you need to answer the question before we take a break.

MR. CEPAR:  You can just --

THE WITNESS:  Oh.

MR. CEPAR:  If you're not sure, just answer the question to the way --

A    I'm not sure, but I would like to be compensated for the loss of doing lots of activities that I like.

BY MR. MITCHELL:

Q    Do you have any out-of-pocket expenses as a result of the events of January 6, 2021?

A    Not that I could necessarily tie directly. But if it is something that has caused my illness to be worse, then additional blood work, doctors' appointments and transitioning to a new medication that's way more expensive than my previous medication seems reasonable.

109

Q    How much more expensive is the new medication?

A    My methotrexate, I believe, was 10 or $20 at the pharmacy, the injections that I took.

And what I take now, Xeljanz, is about $1,400 a month.

Q    So the injections were once a week?

A    Yes, but I would pick up, like, a month's supply at a time.

Q    Okay.  So it was 20 bucks a month, 10 to $20 a month?

A    Yeah.  I think it was maybe 15 or so.  I don't exactly recall.

Q    And the additional blood work, how much more expensive -- how much more are you spending on blood work now?

A    I wasn't tested as often when I was taking methotrexate.  And this new medication, I'm down to four weeks, then six weeks.  So two or three times as often as I was, but I don't know off the top of my head how much that costs because my dad pays for it.

Q    That's not covered by insurance?

A    Some of it is, but a lot of it is specialty blood work or just, like,

SIENA WATCHULONIS - October 23, 2023

110

non-super-routine stuff; and that, I'm pretty sure, is relatively expensive.

Q    And you're still on your parents' insurance until you're 25 or whatever the rule is now?

A    Yes.

Q    And those out-of-pocket expenses are ones that your parents have borne?

A    Yes.

Q    In the week after January 6, 2021, did you take any kind of pain medication, over-the-counter or prescription?

A    I believe I took Aleve, or naproxen is usually what I buy at the pharmacy that I keep around because it helps with my joints in general; but I do remember using that probably every day for, like, a week afterwards, which is not normal for me in other conditions.

Q    Earlier in your deposition, you asked about the emotional -- or you said some -- I asked you a question.  And you said do you want to know about the emotional stress, and I said we'll get there.

What has -- what has been the emotional impact of this for you?

111

A     For me it was really scary to be taunted and arrested very roughly because, in my opinion, I didn't do anything wrong.  And I didn't deserve to be treated like that, let alone be arrested.

And it has made me not want to go to any other peaceful demonstrations that I've heard about or know about or seen because I am scared of getting arrested again and getting hurt again.

Q     Is there any one in particular that you wanted to go to that you decided not to because of January 6, 2021?

A     Not that I can think of off the top of my head, but I've kind of pulled myself away because I don't really want to know if I am too scared to go.

Q     Did it have any impact on your eating habits?

A     I could see the stress affecting how much I would eat, but I can't really say for sure if I wrote down that I was eating less or something like that.

Q     What about sleep?

A     Well, while I was detained, I was up almost all night.  And I don't think I got home until, like, very early in the hours of the day.  And that was really stressful because, as you said,

SIENA WATCHULONIS - October 23, 2023

112

I'm pretty sure my school started very soon around that time or had already begun.  I don't quite remember.  But that would have really stressed me out in terms of being prepared for school because I consider myself a very good student.  I like being prepared.  And that would have been, like, a big burden on my mind and in my sleep that would have pulled me away from school.

Q    Let's go a month out.

Were you having any trouble sleeping a month out as a result of anything that happened on January 6?

A    I don't believe so.

Q    Other than what you've told me with regard to what you believe is the worsening of your -- progression of your condition from the events of January 6, any other physical or mental or emotional impacts from January 6, 2021?

A    No.

Q    Have I already asked you the series of questions about do you know anybody in law enforcement?

A    Yes.

Q    Okay.  Did you take any notes or keep a diary or journal with regard to January 6, 2021?

113

A    I don't believe so, no.

Q    Do you routinely keep any kind of diary, journal, notes to yourself about your volunteer activities?

A    No.

Q    Is your volunteering part of your requirements for your coursework in the program that you're in?

A    Volunteering, as in, like, at the lab?

Q    Well, any of the thing --

A    Oh, oh.

Q    -- activities you're involved in, is any of that part of the requirements for your degree?

A    No.

Q    Is the lab work a requirement?

Do you have a lab requirement for your degree?

A    Not to work in someone else's lab. There's, like, a chemistry lab or something.  But for an unpaid internship, no, it's not expected.

Q    Other than, perhaps, your father, have you talked to anyone else about the events of January 6, 2021, specifically, not just --

A    Oh.

Q    -- we were there and got arrested.  I mean

SIENA WATCHULONIS - October 23, 2023

114

about what actually happened.

A    I don't believe so.

Q    Did you see --

Let's say within the month after January 6, 2021, did you see any of the people that were there that night, any of the other protesters?

A    I probably saw John again at some point, probably also Malcolm since we went to the same school.

Q    Was Mr. Peterson also at Georgia State?

A    I think so, but I -- I know he was a student at some time.

Q    Did you have a --

Did you have any classes with Mr. Green?

A    No.

Q    How did you meet him or just --

A    At a party.

Q    At a party.  You told me that.  Okay.

Have you talked to your dad about what happened that night?

A    Yes.

Q    What's been those conversations?

A    Just how it was very scary to be arrested and treated like I was, and it was hard for him to see as a parent.  It was terrible to watch me be,

115

like, thrown on the ground and dragged and arrested, and it was probably traumatizing for him.

Q    Did he have video of your arrest?

A    I don't know of my arrest specifically, but I don't know if he was filming, like, the whole thing.

Q    So you don't know whether he ran his video from the time y'all started until folks were arrested?

A    I don't know.

Q    Have you asked him?

A    I don't think so.

Q    Take a look at Page 11 of Exhibit No. 12. It's the -- the question actually is on the previous page, page -- it's Interrogatory 18, but it's part of your response I want to ask you about.  You can review it if you want, and then I'll ask a question.

A    Okay.

Q    You say:  I claim punitive damages due to the fact that the officers were fully aware that we did nothing wrong, yet they manufactured a story about an object being thrown, pretended that we were violating pedestrian in the roadway laws, and that we refused to disperse, all in order to retaliate for our protesting.

116

What evidence do you have that the -- that they manufactured the story about an object being thrown?

A    I don't think anybody threw anything.  I think everybody knew it would have been highly disrespectful, considering what we were there for, to just mourn something bad that happened, that there was no reason to make anything violent.  The point was to be peaceful, not continue more violence after something violent had happened.

Q    Are you contending that everybody that was involved in that protest was respectful and peaceful?

A    From what I saw from my perspective, to me it looked that way.

Q    The comments that we heard on the video earlier from Mr. Peterson, do you contend that those were peaceful and respectful?

A    Which comments are you talking about?

Q    Well, he referred to the police officers as piggy and was cursing at the police officers.

Would you call that respectful?

A    I think that's a response to us being taunted.  And I think it shows a sort of irony, considering what we were there mourning was police

SIENA WATCHULONIS - October 23, 2023

117

violence that, in my opinion, was probably unnecessary.  To then advance on us up the street in a very intimidating way to display power I think is ironic.

Q    Did the officers --

Did any of the officers that you recall say anything that suggested to you that their arresting you had anything to do with the fact that you were protesting?

I know you think that, but I'm asking: Did anybody -- did any of the officers say anything?

A    I don't recall specifically.  But if I was to watch all the body cams, I could probably point out to you what, in my opinion, I would view that as.

Q    That would be something that you would have to glean from watching the body-worn camera?

A    Probably.  But, also, I think the act of the officers, effectively, surrounding us and hurting us against a wall closer and closer while telling us to disperse, to me it looked like they thought it was funny.  You can't really see their faces in the body cameras very well.  But as someone on the receiving end, it felt like a threat and something that they thought was funny.

SIENA WATCHULONIS - October 23, 2023

118

MR. MITCHELL:  Thank you, ma'am. That's all I've got right now.  The other lawyers may have questions.

MR. BALCH:  Sorry.  I've got to get back to when I started.

Ms. Watchulonis, my name is Chris Balch.  I represent Major Gary Harper in the lawsuit that you've brought.

EXAMINATION

BY MR. BALCH:

Q    Did you ever turn around to look at the officers behind you in any of the videos we watched when you were being questioned by Mr. Mitchell?

A    Do you mean if I, like, scanned the surrounding as we were moving up the sidewalk?

Q    No, ma'am.  My question was very specific. Did you ever turn around and look behind you at the officers who were behind you as you were walking up the street with your colleagues arm-in-arm?

A    I think I did.

Q    Okay.  Do you recall seeing you turn around and look behind you in any of the videos that we -- that you watched with Mr. Mitchell?

A    I believe so.

SIENA WATCHULONIS - October 23, 2023

119

Q    Okay.  And the video would show whether you did or not; correct?

A    If you look at all of the body cams, possibly, but I didn't watch the whole thing.

Q    Okay.  Would you agree with me that academic success is very important to you?

A    Yes.

Q    Do you study very hard and work very hard to be successful in your studies?

A    I do.

Q    Okay.  And that takes a lot of recall and a lot of ability to recall facts and information for exams?

A    Yes.

Q    Okay.  And what's your GPA at Georgia Tech?

A    Above a 3.5, I believe.

Q    Okay.  And was your GPA in high school also above a 3.5?

A    Yes.  I believe it had to be a 3.8 or above in order for me to qualify for Zell Miller.

Q    Okay.  And the school that you went to in Gwinnett County was a science, technology, engineering and math specific school and program; correct?

SIENA WATCHULONIS - October 23, 2023

120

A    Yes.

Q    Okay.  And that is also sometimes referred to as STEM, S-T-E-M (spelling)?

A    Yes.

Q    Okay.  You've mentioned several times that you believe you were dragged.

Do you recall, in the body-cam videos that you watched with Mr. Mitchell, any of them showing you being dragged along the pavement by the officers?

A    I recall at, I believe, a couple of points watching them physically move us.  But as the person who was on the ground being moved, to me it felt like I was being dragged, even if that wasn't ten feet down the street.

Q    Okay.  And the officers were trying to get you and Mr. Peterson apart; correct?

A    They were until I let go.

Q    All right.  And then even after you let go, Mr. Peterson refused to let go of you; correct?

A    I don't know that for certain because I believe our arms and legs were somewhat tangled together.  And I think the officers being so close around us may have impeded their own abilities to move us apart and -- because we were all so close

121

together.

Q    And you also described a situation as the officers surrounding you.

Were there ever officers in front of the group that you were in as you tried to walk up the -- up the roadway by the Merchandise Mart?

A    I --

To my recollection, I recall there being officers in the front of the group, coming toward us from, like, around the corner and the side and also coming up behind us.

Q    All right.  And at any time did the officers in front of you try to impede your ability to walk up the hill by the Merchandise Mart?

A    Do you mean physically impede?

Q    Yes, physically get in the way and prevent you from walking up the street as you intended to try to do?

A    I think they --

If they didn't, they physically made themselves imposing such to seem that way to us.

Q    I think you told Mr. Mitchell that you did not participate in any of the George Floyd protests for the death of the man in Minneapolis, Minnesota; correct?

SIENA WATCHULONIS - October 23, 2023

122

A     I believe I said I don't recall.

Q     Okay.  Did you participate in any of the protests concerning Rayshard Brooks' shooting at the Wendy's in southeast Atlanta?

A     I don't believe so.

Q     Did I understand correctly, Ms. Watchulonis, you did not ride to downtown from your home with your father?

A     Yes.

Q     Did you know he was attending the protest to video it?

A     I believe he mentioned that he would consider going.

Q     Did you let him know that you were going?

A     Yes.

Q     Do you remember where on the streets the gathering point was for the candlelight vigil, where physically everybody gathered at?

A     I believe it was, like, the intersection. You were supposed to meet on the corner that was, like, nearest to the park.

Q     Okay.  That's at the corner of Centennial Olympic Park Drive and Marietta Boulevard or Marietta Avenue?

A     I'm not sure.

SIENA WATCHULONIS - October 23, 2023

123

Q    Okay.  Do you remember any restaurants or landmarks that were around where y'all were standing?

A    Not specifically.  But if I were to see it on Google Maps, I would probably recognize it.

Q    Okay.  As you walked from the vigil to wherever you were going to, did you pass the Ferris wheel, the SkyView Ferris wheel?

A    I don't believe so.

Q    Okay.  Do you know what street you walked down as you were leaving where the vigil began?

A    No.

Q    Do you know what street you were on when you were arrested?

A    No.

Q    Do you know if you were walking towards where your car was parked or away from where your car was parked?

A    I believe away.

Q    Do you remember walking past the Westin Hotel or walking next to the Westin Hotel as you went on the march after the vigil was over?

A    What do you mean by after the vigil was over?

Q    Well, as you left where the vigil started

SIENA WATCHULONIS - October 23, 2023

124

and you started on your march, did you walk past the Westin Hotel?

A    I don't recall.

Q    Are there any documents or records or anything else that you might have available to you that would help refresh your recollection about what that route was?

A    If I looked at a Google Map Street View or something similar, I would probably recognize more since it was at night.

Q    Did you ever see any officer pull their service weapon while they were either trying to arrest you or trying to tell you to disperse?

A    I don't believe so.  But I was only very focused on the officers that were immediately in front of me and then the ones who had pulled me to the ground, so I wasn't really looking at anyone else.

Q    Okay.  In the videos that you watched with Mr. Mitchell, did you ever see any of the officers with their service weapon drawn?

A    I don't believe so.

Q    Did you see any of the officers with their tasers drawn?

A    I'm not sure.

SIENA WATCHULONIS - October 23, 2023

125

Q    Did you see any of the officers with any pepper spray canisters drawn?

A    I don't believe so.

Q    Would I be fair in saying that you had never been in a situation like this one before?

A    Yes.

Q    And that the experiences that you had on that night were unique in your young life?

A    Yes.

Q    Do you know what your earliest memory is?

A    I believe so.

Q    What's that?

A    Probably learning to read with my dad as a young child.

Q    About how old were you when you recall that happening?

A    Before kindergarten, I believe.

Q    Did you start kindergarten at age four or age five?

A    I don't know.  But I remember being very good at reading, and the teacher was impressed.

Q    Have you spoken to Mr. Peterson about why he wouldn't let you go while the officers were trying to get the two of you apart?

A    I don't believe so.

SIENA WATCHULONIS - October 23, 2023

126

Q    Have you talken -- sorry.  Let me try that again and actually use a word that's in English.

Have you spoken to anyone in the group that you know or that you met that -- about those events of that night since January the 6th of 2021?

A    I don't recall.

Q    Did you have any personal interaction at all with Major Harper during these events?

A    I don't believe so.

Q    Did you --

Have you ever spoken to Major Harper?

A    No.

Q    Did you make any complaints to the Atlanta Police Department through its citizen complaint system?

A    No.

MR. BALCH:  That's all I have.

MR. GREENBLAT:  I don't have any questions.

MR. MITCHELL:  I have a few more.

FURTHER EXAMINATION

BY MR. MITCHELL:

Q    What I've put up on the screen is -- this is timestamp 154 in the video produced by Mr. Watchulonis.

127

Do you recognize that?

Do you want me to show you more of it to give you context?

A    Yes, please.

Q    Sure.  Oops, no sound.

(Video played.)

BY MR. MITCHELL:

Q    Is that voice -- the voice over, is that your father?

A    I don't know.

Q    Do you recognize this as the YouTube video that Mr. Watchulonis produced?

A    Yes.

Q    Does this map refresh your recollection as to where things began and where you were arrested?

A    It's helpful, yes.

Q    Is he accurate that the vigil was down here on the corner of --

I can't remember the name of that road.

MR. BALCH:  Centennial Olympic Park Drive.

BY MR. MITCHELL:

Q    -- Centennial Olympic Park Drive?

A    That that's where it started?

Q    Yes.

128

A    I believe so, yes.

Q    And is it accurate that -- from the way it's reflected on this map, that you-all walked down the middle of the street to get to the point where you turned to head towards the Westin?

A    I don't know if it accurately reflects the distance we traveled in the roadway, but eventually we did cross the street.

Q    But you walked in the roadway for at least part of that route, did you not?

A    A small part, yes.

Q    Okay.  And once you made the right turn to head towards the Westin, were you also in the road?

A    I was not.  I -- after we crossed the road, I, to my best recollection, made it a point to stay out of the road.

Q    Okay.  We've gone back to Officer Jasmyn Wright's [sic] body cam.  This is -- we're at 21:42:05.  This is where she changes your -- the handcuffs for zip ties.

I've stopped it at 21:43:30.

Did you complain when they first put the zip ties on that they were too tight?

A    I don't recall.

Q    So you don't remember when you complained?

SIENA WATCHULONIS - October 23, 2023

129

A    No.

Q    Do you remember to which officer you complained?

A    No.

Q    Was it a male or a female officer?

A    I don't recall.

Q    Don't remember?  Okay.

A    But I do remember at some point I lost feeling in my hands, and I believe that's why I finally complained, because they hurt because I was handcuffed and then zip-tied.  But when I started losing feeling, I believe that's when I complained.

Q    Do you remember whether you were in this room or in a transport vehicle?

A    No.

MR. MITCHELL:  Okay.  All right. That's all I've got.

MR. CEPAR:  I have a couple more.

MR. MITCHELL:  Okay.

EXAMINATION

BY MR. CEPAR:

Q    So, Ms. Watchulonis, let me ask you this. We talked a little bit about the dispersal order and whether or not it was possible to disperse or not.

I just want some more clarification as to

SIENA WATCHULONIS - October 23, 2023

130

whether you thought it was possible to disperse or not.

A    When the dispersal order was finally given, to me it felt like it was far too late to disperse because of the amount of officers that were around us.  And I really felt intimidated to -- if I wanted to leave, I would have had to walk past so many officers, that I felt as though it wasn't a very good option for me to try and leave.

Q    And so do you think it was possible to disperse or not?

MR. MITCHELL:  Object to the form of the question.

BY MR. CEPAR:

Q    You can answer.

A    I don't think it was possible to disperse. I think that --

Q    And why is that?  Why do you think it was not possible?

A    Because the officers were actively closing in as they were telling us to disperse, and it really -- it felt more like just a formality or just they -- they wanted just to say it to get it out there and on the record, that it kind of felt like our fate was already decided at that point because

131

there were so many of them and they were closing in actively.  And so it felt like even if I tried to leave, I probably would have been arrested, anyway.

Q    When you were stand --

Where you were standing when the order of dispersal was given, what was on your right side?

Do you remember?

A    If I recall correctly, it was a big concrete wall.  It was a building.  And so there were really two options to disperse.  It was --

Well, I couldn't go through the group in front of me or behind me if I turned around, so that wasn't an option.  And there were officers all in the street very close to us, and so that didn't really feel like an option.  And in front of us, there was, basically, a line of officers coming up toward us.

And so if I were to disperse, the best route would have been out into the street.  And because I knew that people at protests get arrested if they leave the sidewalk, it felt like a trap, that if I did try and leave, they would have grabbed me because I was in the street.  And I thought that staying on the sidewalk was the safest option.

Q    Okay.  And I would like to now direct your

132

attention to the moment you got arrested.

Would you describe, when and how did you realize you were actually getting arrested?

A    I think from really the time that we were well and truly surrounded, it felt kind of inevitable, which is why I thought it would be better to remain on the sidewalk instead of in the street because at least I would be arrested on the sidewalk and not in the middle of the street because I know that would probably play in some form of what I was charged with.

And so when I was on the sidewalk and we -- it felt like there was, like, a moment of hesitation, and then the officers were, like, waiting on an order.  And they just jumped on people when it was given, and they started arresting everybody they could grab.

Q    And I understand that you felt that it was inevitable that you were going to become arrested.

But when did you realize you were actually getting arrested --

A    It was --

Q    -- that it was happening?

A    It was when John and I got grabbed and pulled away from the group.  I kind of knew that it

was our turn, but it was -- but I was scared because the wall of officers that had been coming at us were yelling at us, and they were so taunting.

And I'd seen the way they grabbed other people, and it was very scary when I knew it was my time and we were on the ground. I just remember being very scared and I froze, because you have a fight and a flight response, but you also have a freeze response; and that was my only option left.

Q    And so my question -- my next question would be --

There was a lot of discussion about whether -- you know, about you holding on to Mr. Peterson and who let go of who first.

Why didn't you let go of Mr. Peterson immediately as you realized you were getting arrested?

A    It really didn't feel like I was holding on to him for a long time. And I think because I was scared and I was frozen, that was kind of my response was to just hold. And then I did let go when I realized that it really wasn't an option for me anymore and that I would have to let go. And so I did, but it didn't feel --

It was very surreal being on the ground

134

and having all these guys screaming at me, all of them, and standing over us and grabbing us, that it was -- it was disorienting at the least, and I was trying to not make it even worse for myself.

Q    So I was -- I would assume that it felt to you like it all happened in an instant?

MR. BALCH:  Object to the form.

A    It --

BY MR. CEPAR:

Q    Let me rephrase the question.

How long did you feel --

How long of a time do you think elapsed between when you felt like -- when you realized that you were getting arrested and the time that you let go of Mr. Peterson?

MR. BALCH:  Same objection.

BY MR. CEPAR:

Q    You can answer.

A    It didn't feel like a very long time.  It felt like maybe 30 seconds before I let go.  And it was everything happening at once.  There was a lot of screaming and yelling and just noise.  And it was really overwhelming, and it kind of sped everything up.

MR. CEPAR:  I have no further

135

questions.

MR. MITCHELL:  Nothing further for me.

MR. BALCH:  Nothing.

MR. GREENBLAT:  Nothing.

COURT REPORTER:  Same orders?

MR. BALCH:  Yes, please.

MR. GREENBLAT:  Yes, please.

MR. CEPAR:  Yep.

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(3), signature of the witness, SIENA WATCHULONIS, has been reserved.)

(Deposition concluded at 4:30 p.m.)

- - -

136

# E R R A T A    S H E E T

I, SIENA WATCHULONIS, the witness herein, have read the transcript of my testimony and the same is true and correct to the best of my knowledge.

\_\_\_\_\_  There are no corrections.
\_\_\_\_\_  Any corrections/additions are listed below.


PAGE/LINE                    SHOULD READ                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


                          _____
                          SIENA WATCHULONIS

137

                    C E R T I F I C A T E


STATE OF GEORGIA:
HENRY COUNTY:


        I hereby certify that the foregoing transcript

was taken down, as stated in the caption, and the

questions and answers thereto were reduced to printing

under my direction; that the foregoing pages 1 through

135 represent a true and correct transcript, to the best

of my ability, of the evidence given upon said hearing,

and I further certify that I am not of kin or counsel to

the parties in the case; am not in the regular employ of

counsel for any of said parties; nor am I in anywise

interested in the result of said case.

        Pursuant to Article 10.B. of the Rules and

Regulations of the Board of Court Reporting of the

Judicial Council of Georgia and O.C.G.A. 15-14-37 (a) and

(b), written disclosure is attached herein.

        This, the 10th day of November, 2023.




_____
MARY K. CALDWELL, CSR, B-1325
Certified Shorthand Reporter
Certification expires 3/31/24

138

DISCLOSURE

STATE OF GEORGIA:
COUNTY OF HENRY:

DEPONENT:  SIENA WATCHULONIS

Date of Deposition:  October 23, 2023

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter.  I am not disqualified for a relationship of interest under the provisions of O.C.G.A. 9-11-28(c).

I am here as a representative of Precision Reporting, Inc.

Precision Reporting, Inc., was contacted by Attorney Thomas Mitchell to provide court reporting services for this deposition.

Precision Reporting, Inc., will not be taking this deposition under any contract that is prohibited by Georgia law.

_____
Mary K. Caldwell, CSR B-1325
Certified Shorthand Reporter
Certification expires 3/31/24



DEFENDANT'S
EXHIBIT
S.W. 3
10/23/23   MKC
PENGAD 800-631-6989



DEFENDANT'S
EXHIBIT
S.10    3
10/20/23   MKC
PENGAD 800-631-6989



DEFENDANT'S
EXHIBIT
S.W. 4
10/23/23   MKC
PENGAD 800-631-6989



DEFENDANT'S
EXHIBIT
S.W. 5
10/23/23 MKC
PENGAD 800-631-6989



DEFENDANT'S
EXHIBIT
S.W. 6
10/23/23  MKC
PENGAD 800-631-6989



DEFENDANT'S
EXHIBIT
S.W. 7
10/23/23  MKC
PENGAD 800-631-6989



DEFENDANT'S
EXHIBIT
S.W. 8
10/23/23  MKC
PENGAD 800-631-6989





DEFENDANT'S
EXHIBIT
S.W. 10
10 23 23 MKC
PENGAD 800-631-6989



DEFENDANT'S
EXHIBIT
S.W. 11
10/23/23 mkc

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA BAKER, et al.

      Plaintiffs,

      v.

CITY OF ATLANTA, et al.

      Defendants.

CIVIL CASE NO.:
1:21-cv-04186-MLB

## PLAINTIFF SIENA WATCHULONIS' RESPONSE TO DEFENDANT JASMYN HAWKINS' FIRST INTERROGATORIES TO PLAINTIFF

COMES NOW Plaintiff Siena Watchulonis ("Plaintiff") by and through the undersigned counsel, and pursuant to Federal Rules of Civil Procedure 33 responds to Defendant Jasmyn Hawkins' numbered Interrogatories as follows:

1.

Please state your date of birth, full name, including every other name by which you have gone or been known during your lifetime, stating the inclusive dates you were known by each such name.

**RESPONSE:**

**Siena Elizabeth Watchulonis,** ▮▮▮▮▮▮▮

1


PENGAD 800-631-6989
DEFENDANT'S
EXHIBIT
S.W. 12
10/23/23 MKC

2.

Please give the complete address of each place where you have resided during the past fifteen (15) years, stating the inclusive date of your residency at each such address.

**RESPONSE:**

**Plaintiff objects to this interrogatory on relevancy grounds.**

3.

If you have ever been married, please state, for each marriage, your spouse's full name and age, the date and place of your marriage (and divorce if applicable), and the names, ages and residences of all children, if any.

**RESPONSE:**

**I have never been married and have no children.**

4.

Please give your employment or occupational background for the past ten (10) years, stating the name and address of each employer (if self-employed, your business), the date of each employment, the job title at each employment, the hours worked per week at each employment, and if lost wages are being sought in this lawsuit, the highest wage or salary earned at each employment.

**RESPONSE:**

I worked at Smokerise Country Club as a server, poolside attendant, and cart attendant from Spring of 2021 to Summer of 2021. Address: 4900 Chedworth Dr Stone Mountain, GA 30087. I worked at Fox Bros BBQ from Summer of 2021 to Summer of 2022. Address: 204 Chattahoochee Row NW Atlanta, GA 30318.

5.

Please give your complete educational background, including high school or equivalent, providing the names of the schools attended, corresponding dates of attendance, and degrees received.

**RESPONSE:**

The Gwinnett School of Mathematics, Science, and Technology, received a high school diploma.

Currently pursuing a Bachelors of Science in Neuroscience at The Georgia Institute of Technology.

6.

If you have ever been a party to any other litigation prior to or contemporaneously with this lawsuit, please state the nature of the suit, the style of the case (identified by court, county, and state), its case number and disposition.

**RESPONSE:**

3

**I have not been a party to any other litigation prior to or contemporaneously with this lawsuit.**

7.

If you have ever been charged or convicted of a crime punishable as either a misdemeanor or a felony (including traffic offenses), please state, as to each instance, the crime charged, the date of prosecution or conviction, the court having jurisdiction (identified by court, county, and state), and the resolution.

**RESPONSE:**

**Aside from the misdemeanor dismissed in connection to this case I have been charged with improper lane change (40-6-123 (A)) in Atlanta Municipal Court, case number: 21TR046580 Atlanta, GA. I plead guilty and paid the fine.**

8.

If you claim that you have been prevented from working at any time as a result of the incident complained of, please state all dates on which you were absent from work as a result of this incident, the amount of any lost wages or salary claimed, and whether you have received any collateral payment (Workers' Compensation, sick leave pay, disability insurance, income protection insurance, or other) on account of any such loss of the time from work or lost income. If collateral payment has been made, please state the amount, source, and date of each such payment.

4

**RESPONSE:**

**I do not claim loss of work.**

9.

Please state the name, address, employer, and present whereabouts of every person who: (a) was a witness to the incident complained of; or (b) has any knowledge of any facts pertaining to any issue in this case.

**RESPONSE:**

**In addition to witnesses identified in Plaintiffs' initial disclosures: Michael Watchulonis and Matt from Atlanta Community Press Collective.**

10.

If you have or if anyone acting for you has obtained from any person named in the response to Interrogatory No. 9 any statement (written, oral, or recorded) concerning any aspect of this litigation, please identify each such statement by stating the name of the person giving the statement, the name of the person taking the statement, the date of the statement, and the present custodian of the statement.

**RESPONSE:**

**I do not have any such statement. I have had conversations with my father about that night. There should be a video recorded by my father Michael Watchulonis.**

5

11.

If there are any photographs, electronic files, other recordings, or drawings related to any aspect of the incident complained of (scene, vehicle, physical object, or person), please identify each, and state the present location and the name of the person having possession, custody, or control of such. This includes but is not limited to any photos or video taken at on the night of the events alleged in your Complaint, or at any other time on January 6, 2021.

**RESPONSE:**

**Beyond what was produced in initial disclosures: video from Michael Watchulonis, that is posted on Youtube.**

12.

If there are other documents or other tangible things which prove, support, or constitute evidence of any fact or circumstance upon which your claim in this litigation is based, please describe all such documents or other tangible things.

**RESPONSE:**

**In addition to items produced in initial disclosures Plaintiff identifies documents in Attachment A and photos of injuries to her hands.**

6

13.

Identify and describe with specificity in detail each and every action of the Defendant that you contend violated your constitutional or statutory rights. Your answer should specifically enumerate what you claim the Defendant did. Identify each witness to each action of which you complain and state each witness' name, address and telephone number. Describe all documents which support or refute your contention that the acts enumerated in your response hereto are violations of your constitutional or statutory rights.

**RESPONSE:**

**I was arrested by defendant Jasmyn Hawkins despite the fact that I did not break the law in any way and was arrested in retaliation for my speech and for being a part of a protest. During my arrest I received injuries.**

14.

Identify and describe with specificity in detail each and every action of the Defendant that you contend was malicious prosecution against Plaintiff. Your answer should specifically enumerate what you claim the Defendant did. Identify each witness to each action of which you complain and state each witness' name, address and telephone number. Describe all documents that support or refute your contention

7

that the acts enumerated in your response hereto are violations of your constitutional or statutory rights.

**RESPONSE:**

**Based on the information obtained from the police report Defendant Jasmyn Hawkins arrested me, issued me a citation, wrote a police report, and swore out a warrant for my arrest. This was the basis for my incarceration and further prosecution in the Municipal Court of Atlanta. Had Defendant not done those things I would not have been prosecuted.**

15.

Describe in detail all activities, whether in public or private, in which you engaged on January 6, 2021. Your answers should include all addresses and locations at which you had been and the appropriate time at that location or address.

**RESPONSE:**

**Plaintiff objects to this interrogatory as vague, overbroad, unduly burdensome, not properly tailored to the issues in this suit, and irrelevant. Plaintiff states that there were many activities Plaintiff was engaged in on that day and the interrogatory does not specify which one of those activities are sought or allegedly relevant. Subject to and without waving said objections Plaintiff states that Plaintiff participated in a vigil and a protest in the evening**

8

hours of January 6, 2021, that Plaintiff broke no laws, but was nevertheless arrested by Defendant.

16.

If you contend any of your public activities on January 6, 2021 were protected by the First Amendment, state each and every fact in support of each such claim.

**RESPONSE:**

**Plaintiff objects to this interrogatory to the extent that it calls for legal analysis. Plaintiff is not an attorney. Subject to and without waiving said objection Plaintiff states that vigil, protest, marching, and other similar activities are protected by the First Amendment. Plaintiff states that she was walking and protesting on a sidewalk, and was not on the road when the police began yelling to get off the road. When finally told to disperse we were already completely surrounded and they were mocking us by saying disperse immediately while herding us up against a wall on the sidewalk and preparing to arrest us no matter what. We were on the sidewalk, back to the wall and unable to disperse when they began grabbing us violently and hurt me and John.**

17.

Identify any statement, written or oral, by a Defendant or other officer, employee, or agent of the City of Atlanta or other law enforcement personnel that you

9

contend supports or refutes your complaint. To qualify as a statement for purposes of this interrogatory, the statement need not be reduced to a formal written document. It can be a mere comment.

**RESPONSE:**

**Plaintiff identifies all statements recorded in the videos that were produced in discovery, as well as all statements written in the police reports, citations and warrants prepared by Defendants.**

18.

Itemize each element of the damages that you are claiming in this lawsuit against the Defendants including, but not limited to, actual and punitive damages. For each individual element of damages claimed, please enumerate with specificity and in detail, the basis therefor. Such bases shall include a listing of all facts supporting each individual element of damages, including the source of each fact listed (witnesses, documents, or both, or other source), as well as a specific showing of precisely how each individual element of damages claimed is calculated.

**RESPONSE:**

**I was unreasonably and unlawfully arrested and prosecuted without probable cause and as a retaliation for exercising my First Amendment rights, was imprisoned and deprived of my liberty, was subjected to physical restraint,**

10

**confinement, and mental suffering and emotional distress, and was also injured during arrest. Pictures of my injuries are included in Attachment A. I claim punitive damages due to the fact that officers were fully aware that we did nothing wrong – yet they manufactured a story about an object being thrown, pretended that we were violating pedestrian in the roadway laws, and that we refused to disperse – all in order to retaliate for our protesting.**

19.

If you claim you suffered physical injuries as a result of actions you contend were in violation of your constitutional or statutory rights, describe such injuries with specificity and in detail. Describe any medical or other treatment you have sought for said injuries. If you contend that you still suffer from these injuries, describe your present symptoms and injuries with specificity and in detail. State the names, addresses and telephone numbers of each and every medical practitioner, consultant, or other person or entity which has treated you for the injuries and/or symptoms alleged herein. Provide the dates of each such medical or quasi-medical treatment.

**RESPONSE:**

**The bruising on my hands and lower arms from the restraints as seen in the images attached. This could have made my autoimmune condition, pertaining to arthritis already existent in my hands previous to this event, worse as they**

11

**suffered direct damage and obstruction of blood flow for at least an hour which is why the bruising appears so bad.**

**There was really no way to treat this severe bruising except be gentle with my hands and give them time to heal while I took a Naproxen (Aleve) for several days to help with the pain.**

20.

Describe with specificity and in detail all communications (oral and written) you have had with other persons (attorneys at law excepted unless you intend to use a recording or any part of a recording of such conversation for any purpose) concerning the subject matter of your complaint and the complaint itself. Describe all documents containing any such communications, including but not limited to, any letters you have sent to others and letters you have received. State the name, address and telephone number of the present custodians of each document listed in response to this interrogatory.

RESPONSE:

**I do not believe I have such documents or access to them. I am not able to recall a passing conversation from years ago if one existed.**

12

21.

Please list every practitioner of the healing arts (physician, dentists, chiropractors, osteopaths, psychiatrist, psychologist, etc.) who has examined or treated you or who has consulted with you for any reason during the past fifteen (15) years, giving the name and address of each such person and the date of and reasons for each such examination, treatment or consultation.

**RESPONSE:**

**I was diagnosed by a Rheumatologist at Children's Hospital of Atlanta Eagleston about 5 or so years ago with Juvenile Idiopathic Arthritis and then later Psoriatic Arthritis. The arthritis mainly affects my hands, hips, feet, neck, and lower back. I receive examinations and comprehensive blood work at Kaiser Permanente (various Atlanta locations) from their Rheumatologists about every 6 months. My main doctor currently is Dr. Payal P. Suthar, a Rheumatologist.**

22.

If you have been a patient, on an in-patient or out-patient basis, in any hospital, infirmary, clinic, sanitarium, asylum, or other similar facility for any reason during your lifetime, please describe each such occasion by giving the name and address of each institution, the dates of each admission and discharge, the reason for each such

13

visit, and the name of your chief attending physician, surgeon, osteopath, or other practitioner of the healing arts during each such visit.

**RESPONSE:**

**I have not.**

23.

Please describe all personal injuries sustained by you before the incident complained of, giving dates of each, and describe any congenital or developmental condition that you had as a result thereof.

**RESPONSE:**

**The diagnosis with Psoriatic Arthritis, about 5 years ago, comes with flair ups of painful symptoms a few times a year, and injuries to the affected joints are much more painful than a normal injury would feel to the average person. I am very sensitive to damage at any of the aforementioned joint locations which includes my hands and wrists which were damaged during the arrest when I told at least one officer the cuffs were too tight and I was losing feeling in my hands.**

24.

If Plaintiff is unable to produce the cellphone or cellphone data as requested in Defendant's First Request for Production of Documents to Plaintiff, please state why Plaintiff was unable to do so, when Plaintiff last had possession of the cellphone or

14

data, what happened to the cellphone or data, whether the cellphone was connected to the "cloud," and all steps Plaintiff or his agents have taken to attempt to retrieve the data.

**RESPONSE:**

**I have my iPhone messages only save to the iCloud for a month (30 days) because I do not pay for excess storage so the messages from that day would not be accessible to me, so I think they do not exist anymore.**

Submitted this 4th day of October, 2023.

/s/ Drago Cepar, Jr.
Drago Cepar, Jr.
Georgia Bar No. 142362

1900 The Exchange
Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dcepar@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2023, I served the foregoing PLAINTIFF

SIENA WATCHULONIS' RESPONSE TO DEFENDANT JASMYN HAWKINS'

FIRST INTERROGATORIES TO PLAINTIFF upon all attorneys of record for

Jasmyn Hawkins as follows:

> THOMAS M. MITCHELL
> ANGELA C. COUCH
> MARY T. MINTER
> CAROTHERS & MITCHELL, LLC
> 1809 Buford Highway
> Buford, GA 30518
> thomas.mitchell@carmitch.com
> angela.couch@carmitch.com
> mary.minter@carmitch.com

This 4th day of October, 2023.

> /s/Drago Cepar, Jr.
> Drago Cepar, Jr.
> Georgia Bar No. 142362

1900 The Exchange
Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dcepar@gmail.com

Attorney for Plaintiffs

16



Siena Watchulonis

SKILLS

Knowledge of neurological circuitry in the brain, general psychology of behavior and neural reward systems. Understanding of cellular and organismal biology, human physiology, and anatomy. Training in scientific study design, data collection, statistical analysis, and critique of study results.

Experience in biological specimen and organic chemistry labs, Certified COVID-19 Contact Tracer, CPR trained, proficient in Spanish, skilled communicator, quick learner, outgoing and always ready to spread positivity.

EXPERIENCE

**Biology Specimen Lab Assistant at Georgia Institute of Technology**

*Assistant advising on laboratory procedures and PPE use*

*Communicator of expectations for lab reports and data collection*

*Data collection experience and designing, construction of biological assays*

May 2022- present

- High volume working environment
- Experience in data collection
- Ability to work alone
- Maintained safe and clean lab
- Skilled at communicating data significance



DEFENDANT'S EXHIBIT
S.W. 13
10/23/23 mKC
PENGAD 800-631-6989

- Understanding of basic statistical analysis of data
- Detail oriented analysis of methodology proposals

**Synthetic Organic Chemistry Lab Assistant at Georgia State University**

*Assistant for data collection and chemical purification of compounds*

May 2020-August 2020

- Collected data on chemical purification results
- Ran chemical reactions under supervision of PhD student
- Oversaw cleaning of lab materials and organization of chemicals

- One of only twelve Metro Atlanta students chosen for GSU's Catch Them Young Program to assist in Factor IXa (blood clotting) research
- Participated in team planning meetings and presentations
- Competed in the GSU 2020 Undergraduate Research Presentation Competition and placed 3rd overall out of fifty contestants

**OrthoAtlanta Orthopedic Surgical Group Lawrenceville, GA**

*Shadowing an Orthopedic Surgeon*

August 2019 - Present

- Preliminary shadowing of orthopedic surgeon rounds post-surgery at clinic

- Understanding of patient interview process and pain management

**University Hospital Augusta, GA**

*Shadowing Ob/Gyn, Interventional Cardiologist, and Noninvasive Cardiologist*

July 7, 2019 - August 1, 2019

- Observed Cathometer Lab surgeries for replacement of valves and implanting of heart stents
- Beginner understanding of heart ultrasounds, nuclear stress tests, and Endoscopy ultrasounds
- Witnessed natural and Cesarean section births and tubal ligation surgeries

- Introduced to EKG readings and interpretation

EDUCATION

**Georgia Institute of Technology**

August 2021-present

Bachelor's in Neuroscience

Minor in Spanish

Minor in Health and Medical Sciences

**The Gwinnett School of Mathematics, Science, and Technology**

August 2016 - May 2020

Advanced math, science, and engineering courses such as AP Chemistry, Calculus II, AP Biology, Chemistry 101, Engineering Applications and Techniques, Elementary Physics, Spanish I-IV, Calculus II, and Analytical Forensic Investigations.

**References available upon request**



Siena Watchulonis

## SKILLS

3.5+ GPA, experienced customer service attendant, CPR trained, proficient in Spanish, skilled communicator, outgoing and always ready to spread positivity.

## EXPERIENCE

**Waitress/ Hostess  at Fox-Bros-BBQ**

*To-go orders management*

*Organizing work stations and multitasking*

*Problem solving and fixing customer's concerns and problems*

September 2021-August 2022

- High volume working environment
- Experience in customer service
- Food and beverage handler
- Welcoming customers to restaurant and problem solving guest issues

**Server and Beverage Cart Attendent at Smoke Rose Country Club**

*Bar attendent and server at poolside cafe*

*Server in club restaurant*

*Beverage cart girl*

March 2021- August 2021

- High volume working environment
- Experience in customer service
- Responsibility handling beverage cart preparation solo
- Maintained perfect and responsible bookkeeping practices

**Professional Nanny Stone Mountain, GA**

*Nanny of two young children, one with developmental disability*

June 2020-March 2021

- Cared for one and two year old
- Played with and began teaching children preschool education material
- Oversaw their nutrition plans and took care of dinner for the family

**Professional Nanny Atlanta, GA**

*Nanny of one child two years old*

June 2020- August 2020

- Spanish speaking nanny to encourage bilingualism in the household
- Oversaw child's nutrition and outings from the house
- Taught preschool material foundations of reading and speech

**OrthoAtlanta Orthopedic Surgical Group Lawrenceville, GA**

*Shadowing an Orthopedic Surgeon*

August 2019 - Current

- Preliminary shadowing of orthopedic surgeon rounds post-surgery at clinic

**University Hospital Augusta, GA**

*Shadowing Ob/Gyn, Interventional Cardiologist, and Noninvasive Cardiologist*

July 7, 2019 - August 1, 2019

- Observed Cathometer Lab surgeries for replacement of valves and implanting of heart stents
- Began learning how to read heart ultrasounds, nuclear stress tests, and Endoscopy ultrasounds
- Witnessed natural and Cesarean section births and tubal ligation surgeries

**Georgia State University, Atlanta, GA**

*Synthetic Organic Chemistry Lab*
*Intern*

May 2018 - July 2018

- One of only twelve Metro Atlanta students chosen for GSU's Catch Them Young Program to assist in Factor IXa (blood clotting) research
- Synthesized arg-gly-arg-spacer-catechol molecule for electrochemical resonance testing with recommended improvements for further experimentation
- Participated in team planning meetings and presentations
- Competed in the GSU 2018 Undergraduate Research Presentation Competition and placed 3rd overall out of fifty contestants

EDUCATION

**Georgia Institute of Technology**

August 2021-present

Neuroscience major, with minors in Spanish and Health and Medical Sciences

**The Gwinnett School of Mathematics, Science, and Technology**

August 2016 - May 2020

Advanced math, science, and engineering courses such as AP Chemistry, Calculus II, AP Biology, Chemistry 101, Engineering Applications and Techniques, Elementary Physics, Spanish I-IV, Calculus II, and Analytical Forensic Investigations.

References available upon request



Atlanta Police Department
Atlanta Police Department

## Case # 210061741 - Incident Report

| REPORT DATE / TIME | ZONE / BEAT / SUBDIVISION 4 / SUBDIVISION 5 | EVENT START DATE / TIME - EVENT END DATE / TIME |
|---|---|---|
| Jan 6, 2021 22:06 | 5 / 508 | Jan 6, 2021 21:37 - 22:00 |

| REPORT AUTHOR | BODY WORN CAMERA? |
|---|---|
| Jasmyn Hawkins #7195 | 1. Yes -- Video Footage Available |

REPORT TAKEN LOCATION

200 TED TURNER DR NW, ATLANTA, GA 30303

## NARRATIVE

On 1/6/2020 at approximately 9:05pm, I, Officer J. Hawkins (#2346) responded to reports of protestors in the area of Andrew Young International Blvd and Ted Turner Drive.

Upon approaching the intersection, I observed a group of approximately 30 people in the distance walking East on Andrew Young International Blvd in the middle of the street while chanting. Lt. Harper of the Atlanta Police department read the dispersal order, which was initially ignored by the group. As Officers responded on foot to the group, they then began moving together towards the sidewalk while locking arms.

Lt. Harper advised all officers on scene via radio that the group threw a rock at his patrol vehicle and continued to stay in the street after the dispersal order was intially read, further stating that all members of the group needed to go to jail.

Ms. Siena Watchulonis (GA OLN # ███████ was a part of the group located in the street. Upon approaching the group and detaining members of the group, she did fall to the ground while interlocked with another member of the protest group before being detained. Ms. Watchulonis did not have any identification on her, but gave her name and information which was verified VIA Omnixx. Ms. Watchulonis was charged with Obstructing Traffic ( OCGA 150-266), and transported to City Jail by way of a City of Atlanta Corrections Van.

Ms. Watchulonis did state that her left ring finger hurt as a result of falling to the ground, but denied needing any attention from Grady EMS after asking numerous times. Ms. Watchulonis' Black Backpack containing her two cellphones, Baton, knife, Helmet, and gas mask along with other miscellaneous items, as well as her Black Bulletproof Vest, were turned in to the Atlanta Public Safety Annex where she can retrieve them. Nothing further to report.

## OFFENSE-1

OFFENSE CODE

Traffic Offenses

| OFFENSE START DATE | OFFENSE END DATE |
|---|---|
| Jan 6, 2021 21:00 | Jan 6, 2021 22:00 |

OFFENSE LOCATION

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

200 TED TURNER DR NW

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| ATLANTA | GA | 30303 | US |

| LOCATION CATEGORY | ZONE / BEAT / SUBDIVISION 4 / SUBDIVISION 5 |
|---|---|
| Highway/ Road/ Alley/ Street/ Sidewalk | 5 / 508 |

VICTIMS-1

VICTIMS-1 NAME

V-1 City of Atlanta

SUSPECTS-1

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Jasmyn Hawkins #7195   Jan 7, 2021 00:05 (e-signature) | Kimberly Collins #5344   Jan 7, 2021 21:57 (e-signature) |
| PRINT NAME | PRINT NAME |
| Jasmyn Hawkins #7195 | Kimberly Collins #5344 |

Atlanta Police Department
Atlanta Police Department

Mark43 RMS Form v2.0 generated by V. TYLER #3031 on Oct 4, 2021 15:05

Pg 1 of 3

| SUSPECTS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| S-1 Watchulonis, Siena E | |

| SEX | RACE / ETHNICITY |
|---|---|
| Female | White / Unknown |

**HOME ADDRESS**

## STOP & THINK

☐ You were in a commercial or residential building or structure

☐ You were not immediately responding to a civilian 911 call

## INVOLVED PERSONS

| INVOLVED PERSON-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| P-1 Watchulonis, Siena E | |

| SEX | RACE / ETHNICITY |
|---|---|
| Female | White / Unknown |

**HOME ADDRESS**

**INVOLVEMENT TYPE A**

Arrestee

## VEHICLE / PROPERTY & ITEMS SUMMARY

| DESCRIPTION / MAKE / MODEL / COLOR | STATUS / DATE / REASON FOR CUSTODY | VIN # / SERIAL # | QTY. | TOTAL ($) VALUE |
|---|---|---|---|---|
| Black Backpack / Black | PROP-Recovered (not for Seized Drugs) / Jan 6, 2021 / Property | | | UNKNOWN |
| Black Bullet Proof Vest / Black | PROP-Recovered (not for Seized Drugs) / Jan 6, 2021 / Property | | 1 | UNKNOWN |

## PROPERTY & ITEMS ADDENDUM

**210061741-1 OTHER ITEM - BLACK BACKPACK**

| ITEM CATEGORY | BIOHAZARD |
|---|---|
| Miscellaneous | ☐ YES ☒ NO |

**DESCRIPTION**

Black Backpack

**COLOR**

Black

**OWNER**

Siena E Watchulonis

| STATUS | STATUS DATE | TOTAL ($) VALUE | IN POLICE CUSTODY |
|---|---|---|---|
| PROP-Recovered (not for Seized Drugs) | Jan 6, 2021 00:00 | UNKNOWN | Yes |

**REASON FOR POLICE CUSTODY**

Property

**RECOVERING OFFICER / ID # / PERSON**

Jasmyn Hawkins #7195

**DROP-OFF LOCATION (DRUGS, GUNS, AND MONEY - ANNEX ONLY!) / INTAKE PERSON**

Annex > Drop-off

**RECOVERED LOCATION**

200 TED TURNER DR NW, ATLANTA, GA 30303

**210061741-2 OTHER ITEM - BLACK BULLET PROOF VEST**

| ITEM CATEGORY | BIOHAZARD |
|---|---|
| Law Enforcement Equipment | ☐ YES ☒ NO |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Jasmyn Hawkins #7195   Jan 7, 2021 00:05 (e-signature) | Kimberly Collins #5344   Jan 7, 2021 21:57 (e-signature) |
| PRINT NAME | PRINT NAME |
| Jasmyn Hawkins #7195 | Kimberly Collins #5344 |

**Atlanta Police Department**
**Atlanta Police Department**
Mark43 RMS Form v2.0 generated by V. TYLER #3031 on Oct 4, 2021 15:05.

Pg 2 of 3

DESCRIPTION

**Black Bullet Proof Vest**

COLOR

**Black**

OWNER

**Siena E Watchulonis**

| STATUS | | STATUS DATE | | TOTAL ($) VALUE | QUANTITY |
|---|---|---|---|---|---|
| PROP-Recovered (not for Seized Drugs) | | Jan 6, 2021 00:00 | | UNKNOWN | 1 |

| IN POLICE CUSTODY | REASON FOR POLICE CUSTODY |
|---|---|
| Yes | Property |

RECOVERING OFFICER / ID # / PERSON

**Jasmyn Hawkins #7195**

DROP-OFF LOCATION (DRUGS, GUNS, AND MONEY - ANNEX ONLY!) / INTAKE PERSON

**Annex > Drop-off**

RECOVERED LOCATION

**200 TED TURNER DR NW, ATLANTA, GA 30303**

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Jasmyn Hawkins #7195   Jan 7, 2021 00:05 (e-signature) | Kimberly Collins #5344   Jan 7, 2021 21:57 (e-signature) |
| PRINT NAME | PRINT NAME |
| Jasmyn Hawkins #7195 | Kimberly Collins #5344 |

# Case # 210061741 - Arrest Report

| REPORT DATE / TIME | ZONE / BEAT / SUBDIVISION 4 / SUBDIVISION 5 | | EVENT START DATE / TIME - EVENT END DATE / TIME |
|---|---|---|---|
| Jan 6, 2021 22:33 | 5 / 508 | | Jan 6, 2021 21:37 - 22:00 |
| REPORT AUTHOR | | BODY WORN CAMERA? | |
| Jasmyn Hawkins #7195 | | 1. Yes — Video Footage Available | |
| REPORT TAKEN LOCATION | | | |
| 200 TED TURNER DR NW, ATLANTA, GA 30303 | | | |

## NARRATIVE

On 1/6/2020 at approximately 9:05pm, I, Officer J. Hawkins (#2346) responded to reports of protestors in the area of Andrew Young International Blvd and Ted Turner Drive.

Upon approaching the intersection, I observed a group of approximately 30 people in the distance walking East on Andrew Young International Blvd in the middle of the street while chanting. Lt. Harper of the Atlanta Police department read the dispersal order, which was initially ignored by the group. As Officers responded on foot to the group, they then began moving together towards the sidewalk while locking arms.

Lt. Harper advised all officers on scene via radio that the group threw a rock at his patrol vehicle and continued to stay in the street after the dispersal order was intially read, further stating that all members of the group needed to go to jail.

Ms. Siena Watchulonis (GA OLN # ████████) was a part of the group located in the street. Upon approaching the group and detaining members of the group, she did fall to the ground while interlocked with another member of the protest group before being detained. Ms. Watchulonis did not have any identification on her, but gave her name and information which was verified VIA Omnixx. Ms. Watchulonis was charged with Obstructing Traffic ( OCGA 150-266), and transported to City Jail by way of a City of Atlanta Corrections Van.

Ms. Watchulonis did state that her left ring finger hurt as a result of falling to the ground, but denied needing any attention from Grady EMS after asking numerous times. Ms. Watchulonis' Black Backpack containing her two cellphones, Baton, knife, Helmet, and gas mask along with other miscellaneous items, as well as her Black Bulletproof Vest, were turned in to the Atlanta Public Safety Annex where she can retrieve them. Nothing further to report.

## ARREST #210061741-1 (ARRESTED ON SCENE (CITY JAIL))

| ARREST DATE / TIME | ARREST TYPE | ARRESTING OFFICER |
|---|---|---|
| Jan 6, 2021 21:37 | Arrested on Scene (City Jail) | Jasmyn Hawkins #7195 |

CHARGE TYPE

City Arrest

### ARRESTEE

| ARRESTEE NAME (LAST, FIRST MIDDLE) | | SEX |
|---|---|---|
| D-1 Watchulonis, Siena E | | Female |
| DOB / ESTIMATED AGE RANGE | RACE / ETHNICITY | |
| ████████ | White / Unknown | |
| PHONE NUMBER | EMAIL ADDRESS | |
| HOME ADDRESS | | |
| ████████████ | | |

ARRESTEE WAS ARMED WITH

Lethal Cutting Instrument / Knife / Sharp Edge

### ARREST LOCATION

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

200 TED TURNER DR NW

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| ATLANTA | GA | 30303 | US |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Jasmyn Hawkins #7195   Jan 7, 2021 00:06 (e-signature) | Kimberly Collins #5344   Jan 7, 2021 21:58 (e-signature) |
| PRINT NAME | PRINT NAME |
| Jasmyn Hawkins #7195 | Kimberly Collins #5344 |

Atlanta Police Department
Atlanta Police Department
Mark43 RMS Form v2.0 generated by V. TYLER #3031 on Oct 4, 2021 15:05

Pg 1 of 2

Case #210061741 - Arrest Report (Atlanta Police Department: Atlanta Police Department)                    Pg 2 of 2

| LOCATION CATEGORY | ZONE / BEAT / SUBDIVISION 4 / SUBDIVISION 5 | |
|---|---|---|
| Highway/ Road/ Alley/ Street/ Sidewalk | 5 / 508 | |

*CHARGES*

| CHARGES - 1 | | ORIGINAL FILE # |
|---|---|---|
| 150-266|PEDESTRIAN OBSTRUCTING TRAFFIC | | 210061741 |

| OFFENSE CODE | OFFENSE START DATE | OFFENSE END DATE |
|---|---|---|
| Traffic Offenses | Jan 6, 2021 21:00 | Jan 6, 2021 22:00 |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Jasmyn Hawkins #7195   Jan 7, 2021 00:06 (e-signature) | Kimberly Collins #5344   Jan 7, 2021 21:58 (e-signature) |
| PRINT NAME | PRINT NAME |
| Jasmyn Hawkins #7195 | Kimberly Collins #5344 |

Pg 2 of 2

**Atlanta Police Department**
**Atlanta Police Department**
*Mark43 RMS Form v2.0 generated by V. TYLER #3031 on Oct 4, 2021 15:05.*